SIDNEY R. SOLOMON AND BEATRICE SOLOMON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

SAMUEL KATKIN AND DORIS KATKIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1281–74, 1305–74.   Filed December 6, 1976.

*Robert L. Litt and Robert W. Siegel,* for the petitioners.
*Peter M. Ritteman,* for the respondent.

---

OPINION

GOFFE, *Judge:* The Commissioner determined the following deficiencies in petitioners' Federal income taxes for the taxable year 1971:

| Docket No. | Petitioners | Deficiency |
|---|---|---|
| 1281–74 | Sidney R. and Beatrice Solomon............ | $46,492.42 |
| 1305–74 | Samuel and Doris Katkin........................ | 15,254.17 |

The cases were consolidated for purposes of trial, briefing, and opinion. Concessions having been made, the sole issue for decision is whether shares received more than 3 years after the initial exchange in a nontaxable corporate reorganization pursuant to sections 354(a)(1)[1] and 368(a)(1)(B) constitute payments subject to the imputed interest provisions of section 483.

The consolidated cases were submitted under Rule 122, Tax Court Rules of Practice and Procedure. All of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated by this reference. Only the facts necessary for an understanding of our opinion will be summarized below.

Petitioners Sidney R. and Beatrice Solomon, husband and wife, resided in New York City, N.Y., at the time they filed their petition in this proceeding. They filed a joint Federal income tax return for the taxable year 1971 with the Internal Revenue Service Center, Covington, Ky.

Petitioners Samuel and Doris Katkin, husband and wife, resided in Farmington, Mich., at the time they filed their petition. They also filed a joint Federal income tax return for the taxable year 1971 with the Internal Revenue Service Center, Covington, Ky.

Prior to August 19, 1968, Mr. and Mrs. Solomon and Mr. and Mrs. Katkin were owners of all the outstanding capital stock of Quinn Manufacturing Co. (hereinafter Quinn), a Michigan corporation, having its principal place of business in Allen Park, Mich. Each petitioner owned 25 shares of the capital stock of Quinn. Quinn owned 300 shares of the

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

outstanding capital stock of Detroit Bolt & Nut Co. (hereinafter Detroit), a Michigan corporation having its principal office in Allen Park, Mich. The remainder of the outstanding capital stock of Detroit was owned by petitioners in the following amounts:

| Owner | Number of shares | Owner | Number of shares |
|---|---|---|---|
| Sidney R. Solomon | 1,391.5 | Samuel Katkin | 1,522.0 |
| Beatrice Solomon | 931.5 | Doris Katkin | 783.0 |

On August 19, 1968, Sidney and Beatrice Solomon entered into an acquisition agreement and plan of reorganization with Whittaker Corp. (hereinafter Whittaker), a California corporation having its principal office in Los Angeles, Calif. The agreement provided for the acquisition of all of the stock of Quinn and Detroit owned by Mr. and Mrs. Solomon in exchange for voting stock of Whittaker. In consideration for the transfer of his shares in Quinn and Detroit, Sidney Solomon was to receive 6,037 shares of Whittaker's $5 par value preferred stock and such number of its shares of common stock as had an aggregate fair market value of $1,373,387, but not in excess of 22,890 shares. In exchange for the transfer of her shares in the two corporations, Beatrice Solomon was to receive 3,963 shares of Whittaker's $5 par value preferred stock and such number of shares of its common stock as had a fair market value of $901,613, but not in excess of 15,027 shares. On August 19, 1968, Mr. and Mrs. Solomon received the designated number of preferred shares and the maximum number of common shares that could initially be received under the agreement. The shares of stock received were subject to substantial restrictions on transferability. In addition, because of the difficulty in valuing the shares exchanged and as further consideration to petitioners, the agreement provided for the issuance of additional shares if the value of the common stock received and still retained by petitioners on August 19, 1971, was less than 120 percent of its value on August 19, 1968, or if the value of the preferred shares received was less than $100 per share. The agreement further provided that the maximum number of shares which might be issued be placed in a reserve account to be established by Whittaker for possible future delivery. The

agreement did not provide for the payment of interest on such additional shares. On September 27, 1971, pursuant to its obligations under the agreement, Whittaker issued 29,797 additional shares of its common stock to Sidney Solomon and 19,561 shares to Beatrice Solomon. The shares were registered under the Securities Act of 1933, as amended, and had a value of $10.125 per share.

On August 19, 1968, Samuel and Doris Katkin also entered into an acquisition agreement and plan of reorganization with Whittaker providing for the exchange of all of their stock in Quinn and Detroit for voting stock of Whittaker. Under the terms of the agreement, Samuel Katkin was to receive such number of shares of common stock of Whittaker as had a fair market value of $1,039,977, up to a maximum of 17,333 shares; Doris Katkin was to receive such number of shares of common stock as had a fair market value of $535,023, but not in excess of 8,917 shares. On August 19, 1968, both petitioners received the maximum number of shares which could be initially received under the agreement. The shares, like those issued to Mr. and Mrs. Solomon, were subject to substantial restrictions on transferability. The agreement also provided for the issuance of additional shares if the value of the shares retained by petitioners on August 19, 1971, was less than 120 percent of their value on August 19, 1968. The maximum number of shares which might be issued was to be placed in a special reserve account. No provision was made for the payment of interest on the additional shares. On September 27, 1971, Whittaker issued 15,671 additional shares to Samuel Katkin and 8,066 additional shares to Doris Katkin. The shares were registered under the Securities Act of 1933, as amended, and had a value of $10.125 per share.

The exchanges of stock between petitioners and Whittaker qualified as a tax-free reorganization under sections 354(a)(1)[2] and 368(a)(1)(B).[3]

---

[2] SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.
(a) GENERAL RULE.—
(1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.
[3] SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.
(a) REORGANIZATION.—

The Commissioner, in his statutory notices of deficiency, determined that petitioners received interest income pursuant to section 483 on the receipt of the additional Whittaker shares in 1971.

Section 483[4] was added to the Internal Revenue Code in 1964 to correct a practice whereby a seller of property on the installment basis was able to convert what would otherwise

---

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

\* \* \*

(B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition);

[4] SEC. 483. INTEREST ON CERTAIN DEFERRED PAYMENTS.

(a) AMOUNT CONSTITUTING INTEREST.—For purposes of this title, in the case of any contract for the sale or exchange of property there shall be treated as interest that part of a payment to which this section applies which bears the same ratio to the amount of such payment as the total unstated interest under such contract bears to the total of the payments to which this section applies which are due under such contract.

(b) TOTAL UNSTATED INTEREST.—For purposes of this section, the term "total unstated interest" means, with respect to a contract for the sale or exchange of property, an amount equal to the excess of—

(1) the sum of the payments to which this section applies which are due under the contract, over

(2) the sum of the present values of such payments and the present values of any interest payments due under the contract.

For purposes of paragraph (2), the present value of a payment shall be determined, as of the date of the sale or exchange, by discounting such payment at the rate, and in the manner, provided in regulations prescribed by the Secretary or his delegate. Such regulations shall provide for discounting on the basis of 6-month brackets and shall provide that the present value of any interest payment due not more than 6 months after the date of the sale or exchange is an amount equal to 100 percent of such payment.

(c) PAYMENTS TO WHICH SECTION APPLIES.—

(1) IN GENERAL.—Except as provided in subsection (f), this section shall apply to any payment on account of the sale or exchange of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange under a contract—

(A) under which some or all of the payments are due more than one year after the date of such sale or exchange, and

(B) under which; using a rate provided by regulations prescribed by the Secretary or his delegate for purposes of this subparagraph, there is total unstated interest.

Any rate prescribed for determining whether there is total unstated interest for purposes of subparagraph (B) shall be at least one percentage point lower than the rate prescribed for purposes of subsection (b)(2).

constitute interest income into capital gain by inflating the purchase price and not providing for the payment of interest on the deferred payments. H. Rept. No. 749, 88th Cong., 1st Sess. 72 (1963). In general, section 483 requires that in the case of a contract for the sale or exchange of property under which deferred payments are due more than 1 year from the date of such sale or exchange and which provides for either no interest or interest payments at a rate below that specified in the Treasury Regulations, a portion of each payment received more than 6 months after the date of sale or exchange be treated as interest.

---

(2) TREATMENT OF EVIDENCE OF INDEBTEDNESS.—For purposes of this section, an evidence of indebtedness of the purchaser given in consideration for the sale or exchange of property shall not be considered a payment, and any payment due under such evidence of indebtedness shall be treated as due under the contract for the sale or exchange.

(d) PAYMENTS THAT ARE INDEFINITE AS TO TIME, LIABILITY OR AMOUNT.—In the case of a contract for the sale or exchange of property under which the liability for, or the amount or due date of, any portion of a payment cannot be determined at the time of the sale or exchange, this section shall be separately applied to such portion as if it (and any amount of interest attributable to such portion) were the only payments due under the contract; and such determinations of liability, amount, and due date shall be made at the time payment of such portion is made.

(e) CHANGE IN TERMS OF CONTRACT.—If the liability for, or the amount or due date of, any payment (including interest) under a contract for the sale or exchange of property is changed, the "total unstated interest" under the contract shall be recomputed and allocated (with adjustment for prior interest (including unstated interest) payments) under regulations prescribed by the Secretary or his delegate.

(f) EXCEPTIONS AND LIMITATIONS.—

(1) SALES PRICE OF $3,000 OR LESS.—This section shall not apply to any payment on account of the sale or exchange of property if it can be determined at the time of such sale or exchange that the sales price cannot exceed $3,000.

(2) CARRYING CHARGES.—In the case of the purchaser, the tax treatment of amounts paid on account of the sale or exchange of property shall be made without regard to this section if any such amounts are treated under section 163(b) as if they included interest.

(3) TREATMENT OF SELLER.—In the case of the seller, the tax treatment of any amounts received on account of the sale or exchange of property shall be made without regard to this section if no part of any gain on such sale or exchange would be considered as gain from the sale or exchange of a capital asset or property described in section 1231.

(4) SALES OR EXCHANGES OF PATENTS.—This section shall not apply to any payments made pursuant to a transfer described in section 1235(a)(relating to sale or exchange of patents).

(5) ANNUITIES.—This section shall not apply to any amount the liability for which depends in whole or in part on the life expectancy of one or more individuals and which constitutes an amount received as an annuity to which section 72 applies.

Petitioners do not contend that the shares transferred in 1971 are not payments for their stock, but they, instead, contend that the shares transferred to them are not "payments" within the meaning of section 483. Moreover, the regulations specifically include stock within the meaning of the term "payments," sec. 1.483–1(b)(1)(ii), Income Tax Regs., a term which may have different meanings when used in different Code sections. See *Don E. Williams Co.*, 62 T.C. 166, 169 (1975), affd. 527 F.2d 649 (7th Cir. 1975), cert. granted 426 U.S. 919 (1976).

Petitioners first maintain that section 483 does not apply to deferred payments received in transactions qualifying for nonrecognition treatment under sections 354(a)(1) and 368(a)(1). Section 483(c)(1) provides in pertinent part as follows:

(c) PAYMENTS TO WHICH SECTION APPLIES.—

(1) IN GENERAL.—*Except as provided in subsection (f)*, this section shall apply to *any payment* on account of the sale or *exchange* of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange * * * [Emphasis added.]

Thus, the plain wording of the statute makes it clear that the provision is applicable to *any* deferred payment received on the exchange of property under a contract in which no interest or inadequate interest is provided, irrespective of whether gain or loss is recognized on the exchange, except in those five instances specified in subsection (f). Despite the fact that tax-free reorganizations are not mentioned in the legislative history of the statute, we are unable to disregard, as petitioners would have us do, the express language of the provision and the failure of Congress to include such exchanges within the list of exceptions to the statute. Had Congress intended to except deferred payments received in tax-free reorganizations from the imputed interest provisions of section 483, it certainly would have done so in subsection (f). See Sutherland, 2A Statutes and Statutory Construction, sec. 47.23 (4th ed. 1973). In addition, our conclusion that section 483 is applicable to deferred payments received in a tax-free corporate reorganization is supported by the legislative history which indicates that Congress intended that the

rules of section 483 be applicable for all purposes of the Code.[5] Although petitioners do not specifically challenge the validity of any of the Treasury regulations under section 483, their position is tantamount to contending that section 1.483–1(b)(6), example *(7)*, Income Tax Regs., is invalid.

In the alternative, petitioners contend that the application of section 483 in the context of corporate reorganizations is limited to contingent "earn-out"[6] situations and that the provision does not apply to deferred payments based upon the future value of the stock of the acquiring corporation. In support of their contention, petitioners merely point to the fact that the committee reports[7] and the Treasury regulations[8] only contain examples of "earn-out" situations. We are unwilling to hold that the application of section 483 is so limited. Petitioners' argument is not supported by the language of the statute, the legislative history, or the Treasury regulations. The examples in the committee reports and Treasury regulations are merely illustrative; they do not purport to limit the application of section 483 to situations in which deferred payments are based on the earnings of the acquired corporation. The existence of deferred payments without provision for adequate interest, not the manner in which the deferred payments are computed, is determinative of the applicability of section 483.[9]

Petitioners' final contention is that the "reserve stock accounts" which Whittaker was required to establish pursuant to the terms of the reorganization agreements are sufficiently analogous to the escrow arrangement described in Rev. Rul. 70–120, 1970–1 C.B. 124, so as to require that the additional shares be treated as having been transferred to petitioners on the effective date of the reorganization. In Rev.

---

[5] H. Rept. No. 749, 88th Cong., 1st Sess. A84 (1963), provides in part as follows:

"Section 483(a) provides the general rule that part of each payment (under a contract for the sale or exchange of property) to which section 483 applies is to be treated as interest *for all purposes of the code.* [Emphasis added.]"

[6] An "earn-out" provides for the issuance or delivery of additional shares of stock at designated dates after the initial exchange of stock based upon the success of the acquired corporation.

[7] H. Rept. No. 749, 88th Cong., 1st Sess. 72 (1963); S. Rept. No. 830, 88th Cong., 2d Sess. 103 (1964).

[8] Sec. 1.483–1(b)(6), examples *(7)* and *(8)*, Income Tax Regs.

[9] We express no opinion as to the validity or applicability of Rev. Rul. 73–298, 1973–2 C.B. 173.

Rul. 70–120 a designated number of the shares of common stock received by the shareholders of the transferor corporation in a corporate merger was immediately deposited in escrow with a bank. The shares so deposited were issued in the names of the shareholders of the transferor corporation who were, during the period held in escrow, entitled to vote the escrowed shares as well as receive all dividends paid. A portion of such shares was subject to retransfer in the event the earnings of the business formerly conducted by the transferor corporation did not maintain a specified level for the taxable year of the merger and the 2 succeeding years. To the extent that the specified earning levels were met, the shares held in escrow were to be released and delivered to the shareholders in each of the 3 taxable years according to the terms of the escrow agreement. The ruling held that all of the shares placed in escrow were transferred on the effective date of the reorganization and, therefore, section 483 was not applicable. In the instant case, petitioners were not entitled to vote the contingent shares or receive any dividends paid on such shares; nor was a valid escrow created.[10] Accordingly, we conclude that the reserve stock accounts are not sufficiently similar to the escrow arrangement described in Rev. Rul. 70–120 to come within the ambit of the ruling. However, we express no opinion as to the validity of the revenue ruling in question as petitioners have not sought to litigate its correctness and it is, therefore, unnecessary for us to examine its validity.

Accordingly, based on the foregoing, we hold that the contingent payments of Whittaker stock received by petitioners in 1971 are subject to the imputed interest provisions of section 483.

*Decisions will be entered under Rule 155.*

---

[10] A deposit with a third person not a party to the agreement is necessary for the creation of a valid escrow. 30A C.J.S., Escrows, sec. 4–7 (1965).