JOHN COCKER III AND DOROTHY COCKER, ET AL.,[1] PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2754–74—2756–74.  Filed July 25, 1977.

---

*Steve C. Horowitz* and *Joseph B. Alala, Jr.,* for the petitioners.

*Frank D. Armstrong, Jr.,* for the respondent.

IRWIN, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax for the calendar years 1969 and 1971 as follows:

| Docket No. | | Deficiencies | |
| --- | --- | --- | --- |
| | | *1969* | *1971* |
| 2754–74 | John Cocker III and Dorothy Cocker .... | $20,526.10 | $24,973.93 |
| 2755–74 | F. Hoyt Cunningham, Jr., and Helen Cunningham.......................................... | 168.90 | 209.71 |
| 2756–74 | Mary C. Parker......................................... | 257.40 | 175.59 |

The three dockets have been consolidated for purposes of trial, briefing, and opinion. The only issue we have to decide is whether any portion of the Walter Kidde & Co., Inc., stock received by certain of the petitioners pursuant to a plan of reorganization under section 368(a)(1)(B) of the Internal Revenue Code of 1954[2] constitutes interest income under section 483. Petitioners in docket No. 2754–74 have conceded the correctness of respondent's other adjustments in the notice of deficiency (except to the extent the computation of the medical expense deduction hinges on the outcome of the section 483 issue). Respondent made no other adjustments in the notices of deficiency in the two remaining dockets.

### FINDINGS OF FACT

Most of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioners John Cocker III and Dorothy Cocker, husband and wife, and Mary C. Parker (formerly Mary Elva Cocker) resided in Clover, S.C., at the time of filing their petitions in

---

[2] All statutory references hereafter refer to the Internal Revenue Code of 1954, as in effect for the years in issue, unless otherwise indicated.

this Court. Petitioners F. Hoyt Cunningham, Jr., and Helen Cunningham, husband and wife, resided in Gastonia, N.C., at the time of filing their petition. All the petitioners filed Federal income tax returns for the years in issue with the Director, Southeast Service Center, Chamblee, Ga.

Cocker Machine & Foundry Co., Inc. (hereafter referred to as Cocker), was a corporation organized under the laws of the State of North Carolina, and was engaged in the manufacture of textile machines in Gastonia, N.C.

Walter Kidde & Co., Inc. (hereafter referred to as Kidde), was organized under the laws of the State of New York, and has its principal place of business in Belleville, N.J. Kidde is a national and international conglomerate with businesses in the fields of safety security and protection, aerospace systems and equipment, merchandising equipment, consumer products, and textile machinery.

On July 1, 1964, the shareholders of Cocker entered into an "Agreement and Plan of Reorganization" (hereafter referred to as the agreement or reorganization agreement) with Kidde. Under the terms of the agreement, Kidde acquired all of the outstanding capital stock of Cocker in exchange solely for common stock of Kidde having a par value of $2.50 per share.

The above agreement was executed on July 3, 1964, at which time there were 1,867 shares of Cocker stock issued and outstanding. Kidde issued 78,361 shares of its common stock (having a fair market value at that time of $18 per share) in exchange for all the outstanding Cocker stock.

The parties to this exchange determined that the book value of the Cocker stock on July 3, 1964, was $1,410,498. Respondent adjusted this value to $1,429,177 after audit without objection from petitioners.

The names of the Cocker shareholders at the time of the exchange, the number of Cocker shares relinquished by such shareholders, and the number of Kidde shares received in the exchange are as follows:

| Name of shareholder | Number of Kidde shares received | Number of Cocker shares given |
|---|---|---|
| John Cocker III | 48,183 | 1,148 |
| Dorothy Cocker | 3,274 | 78 |
| John C. Bodansky | 2,099 | 50 |
| F. Hoyt Cunningham | 839 | 20 |

| | | |
|---|---:|---:|
| Wachovia Bank & Trust Co., as executor and trustee, and John Cocker III, as trustee named under the last will and testament of Mary Lovett Cocker, deceased.............. | 20,860 | 497 |
| Wachovia Bank & Trust Co. and Kattie Moore Rankin Cunningham, as coexecutors named under the last will and testament of James W. Cunningham........................... | 839 | 20 |
| First Union National Bank, as general guardian for Mary Elva Cocker, a minor .............................................................. | 1,763 | 42 |
| First Union National Bank, as general guardian for Ann Elise Cocker, minor ................................................................. | 504 | 12 |
| Totals............................................................................ | 78,361 | 1,867 |

The above distribution of Kidde stock on July 3, 1964, had a total fair market value of $1,410,498 and will hereafter sometimes be referred to as the "first distribution."

A "second distribution" was provided for in paragraph 2.2 of the reorganization agreement as follows:

2.2 *Second Distribution.* The second distribution by KIDDE of KIDDE STOCK (valued at the average closing price per share during the period of 30 market days prior to the end of the period ending December 31, 1968) shall be in an amount determined, and shall be delivered, as follows:

a. The aggregate net earnings before income taxes but after intercompany eliminations of COCKER and the present Kidde Textile Machinery Division (excluding exceptional items of a non-recurring nature aggregating in excess of $100,000) determined in accordance with generally accepted accounting principles applied on a basis consistent with prior periods for the three years most favorable to COCKER STOCKHOLDERS of the four years beginning January 1, 1965, and ending December 31, 1968, will be reduced by $600,000;

b. 48% of the amount resulting from the computation set forth in Subparagraph "a" above shall constitute the basis of the second distribution; but,

c. in no event shall this second distribution when added to the amount of the first distribution be less than $1,800,000 nor more than $2,400,000.

d. The foregoing computation shall nevertheless be subject to adjustment for liabilities and claims aggregating in excess of $25,000 not shown or adequately reserved for on the audited COCKER Balance Sheet dated July 3, 1964 which are ascertained at any time during the period between July 3, 1964 and the second distribution (that is to say, such liabilities and claims shall be deducted from the amount of the second distribution) subject, however, to the following:

(i) The deduction for such liabilities and claims shall be limited so that in no event will the value of the second distribution, when added to the value of stockholders' equity shown on the COCKER Balance Sheet dated July 3, 1964, be less than $1,500,000.
* * *

The shares of KIDDE STOCK constituting such second distribution shall be delivered to the COCKER STOCKHOLDERS or their personal representatives, heirs, or distributees in the same proportion as the first distribution

within 30 days after the delivery of the audited report of COCKER's Certified Public Accountants with the financial statements of COCKER (the Balance Sheet as of December 31, 1968 and the Statement of Operations for the period ended December 31, 1968) attached thereto. Fractional shares shall be rounded so that each COCKER STOCKHOLDER will receive KIDDE STOCK to the nearest whole share. No cash or other property excepting KIDDE STOCK shall be distributed to the COCKER STOCKHOLDERS.

The Cocker shareholders and Kidde disagreed over the number of shares of Kidde stock to be distributed under paragraph 2.2 of the agreement. This disagreement focused on the amount of the contingent or undisclosed liabilities to be offset against the minimum purchase price (see subparagraph (d) of paragraph 2.2 in the agreement).

On May 19, 1969, the Cocker shareholders instituted a lawsuit in the Superior Court of Gaston County, N.C., seeking a mandatory injunction compelling Kidde to comply with paragraph 2.2 of the reorganization agreement and deliver the stock and financial statements prescribed therein.[3]

On July 3, 1969, Kidde distributed 4,049 shares of its $2.50 par value common stock to the Cocker shareholders. The Cocker shareholders accepted the stock distributed under protest and without prejudice to their rights under the agreement. On the date of this distribution the fair market value of Kidde stock was $41.25 per share, giving a total value for the distributed stock of $167,021.25. Petitioners in docket No. 2754–74 received 3,737 shares of the stock distributed with a total fair market value of $154,151.25. Petitioner F. Hoyt Cunningham, Jr., in docket No. 2755–74 received 43 shares with a value of $1,773.75, and petitioner Mary C. Parker in docket No. 2756–74 received 91 shares with a value of $3,753.75.

The following reflects the allocation of shares of Kidde stock among the Cocker shareholders in the July 3, 1969, distribution:

---

[3] Although the parties have stipulated that the lawsuit was instigated by the shareholders of Cocker, the copy of the "Complaint" attached to the stipulations indicates only one plaintiff, John Cocker III, and does not purport to be a representative action on behalf of anyone other than Mr. Cocker. No explanation for this discrepancy appears in the record, nor do we find it significant.

| Name | Number of shares | Value |
|---|---|---|
| John Cocker III | 2,490 | $102,712.50 |
| Dorothy Cocker | 169 | 6,971.25 |
| John C. Bodansky | 109 | 4,496.25 |
| F. Hoyt Cunningham | 43 | 1,773.75 |
| First Union National Bank, as successor trustee, and John Cocker III, as trustee named under the last will and testament of Mary Lovett Cocker, deceased | 1,078 | 44,467.50 |
| Wachovia Bank & Trust Co. and Kattie Moore Rankin Cunningham, as coexecutors named under the last will and testament of James W. Cunningham | 43 | 1,773.75 |
| First Union National Bank, as general guardian for Mary Elva Cocker, minor | 91 | 3,753.75 |
| First Union National Bank, as general guardian for Ann Elise Cocker, minor | 26 | 1,072.50 |
| Totals | 4,049 | 167,021.25 |

The Cocker shareholders believed they were entitled to more shares of Kidde stock under paragraph 2.2 of the reorganization agreement than the 4,049 shares distributed. Accordingly, certain of the Cocker shareholders filed a second lawsuit demanding, inter alia, that Kidde distribute additional shares of stock as required by the reorganization agreement. However, before trial a basis for settlement was reached, and on March 31, 1971, a consent decree was entered requiring Kidde to distribute 4,844 shares of its common stock to the plaintiffs in the lawsuit. Such distribution was actually made on March 9, 1971, prior to the consent decree. At the same time 656 additional Kidde shares were distributed to Cocker shareholders who were not parties to the lawsuit. The fair market value of Kidde stock at the time of this distribution was $30.50 per share.

The following reflects the allocation of shares of Kidde stock among the Cocker shareholders in the March 9, 1971, distribution:

| Name | Number of shares | Value |
|---|---|---|
| John Cocker III | 3,381 | $103,120.50 |
| First Union National Bank, as successor trustee, and John Cocker III, as trustee named under the last will and testament of Mary Lovett Cocker, deceased | 1,463 | 44,621.50 |
| Dorothy Cocker | 231 | 7,045.50 |
| John C. Bodansky | 149 | 4,544.50 |
| First Union National Bank, as general guardian for Mary Elva Cocker, minor | 121 | 3,690.50 |
| F. Hoyt Cunningham | 61 | 1,860.50 |
| Wachovia Bank & Trust Co. and Kattie Moore Rankin Cunningham, as coexecutors named under the last will and testament of James W. Cunningham | 61 | 1,860.50 |

| | | |
|---|---|---|
| First Union National Bank, as general guardian for Ann Elise Cocker, minor | 33 | 1,006.50 |
| Totals | 5,500 | 167,750.00 |

Of the $167,750 of Kidde stock distributed in this latest distribution, petitioners in docket No. 2754–74 received 5,075 shares of stock with a fair market value of $154,787.50. Petitioner F. Hoyt Cunningham, Jr., in docket No. 2755–74 received 61 shares with a fair market value of $1,860.50, and petitioner Mary C. Parker in docket No. 2756–74 received 121 shares with a fair market value of $3,690.50.

The fair market value of the 4,049 shares of Kidde stock distributed on July 3, 1969, plus the fair market value of the 5,500 shares distributed on March 9, 1971, totals $334,771.25. When added to the first distribution of stock in 1964 of $1,410,498, the resulting fair market value for all the stock distributed pursuant to the reorganization agreement is $1,745,269.25.

The July 3, 1969, distribution and the March 9, 1971, distribution together form the "second distribution" of stock under paragraph 2.2 of the reorganization agreement.

At the time of the "first distribution" the Kidde stock was listed on the American Stock Exchange. At the times of the "second distribution" the Kidde stock was listed on the New York Stock Exchange.

Petitioners did not report any income arising from the reorganization in their income tax returns for 1969 and 1971. In the notices of deficiency respondent determined that a portion of the Kidde shares received by petitioners in the years in question represented unstated interest income under section 483.

The parties agree that the transaction outlined in the "Agreement and Plan of Reorganization" was a "reorganization" within the meaning of section 368(a)(1)(B).

### OPINION

The issue before us is whether any portion of the Kidde stock received by certain of the petitioners in 1969 and 1971 pursuant to a corporate reorganization under section 368(a)(1)(B) is taxable as interest income under section 483.

Petitioners argue that they neither realized nor recognized any income on the exchange of their Cocker stock for the

stock of Kidde. This argument appears to be based on sections 354(a) and 368(a)(1)(B) (as well as section 1001) and proposes that Congress never intended for section 483 to be applied to tax-free reorganizations. Petitioners contend that the only purpose behind section 483 was to prevent the conversion of ordinary income into capital gain on installment sales. They believe no income was "generated" by the exchange in question, and section 483 cannot be used to "create" interest income.

Petitioners contest the validity of section 1.483–2(b)(3)(i), Income Tax Regs., which holds section 483 applicable to nontaxable reorganizations under section 354(a). Further, they contend that any imputed interest under section 483 would constitute "boot" received in the reorganization and disqualify the transaction under section 368(a)(1)(B).

Petitioners also argue that respondent is "estopped" from applying section 483 to "B" reorganizations. This argument, although circular and somewhat confusing, reasons that because interest income imputed under section 483 would be "boot" in a "B" reorganization, it is taxable as ordinary income under section 356, and therefore comes within the exception to section 483 stated in section 483(f)(3).

Further, petitioners claim that because respondent does not apply section 483 to distributions in complete or partial liquidation of a corporation, see sec. 1.483–1(b)(1), Income Tax Regs., he cannot apply the section to reorganizations defined in section 368. Petitioners raise the banner of discrimination as a bar to the adjustments made by respondent in their case.

Petitioners also argue that if Congress intended to have section 483 take precedence over section 368(a)(1) it would have said so. Petitioners draw an analogy to section 1245 where Congress expressly provided in subsection (d) that section 1245 "shall apply notwithstanding any other provision of this subtitle." Because no similar provision exists in section 483, petitioners believe section 368 takes precedence in this case.[4]

---

[4] See also sec. 351(b) which petitioners contend carves out an exception to the nonrecognition provision of sec. 351(a) and lends further support to their argument that Congress did not intend sec. 483 to be applied in the present case. Petitioners apparently feel that unless Congress provides express exceptions to specific nonrecognition provisions of the Code, then no exceptions exist.

Addressing the particular facts of their case, petitioners claim that even if section 483 may be applied to certain "B" reorganizations, such as where a deferred payment is based on future earnings, their circumstances call for a different result. They argue that the "second distribution" of Kidde stock (which itself comprised two distributions) was based on a "guaranteed minimum purchase price" (subject to adjustment for contingent or undisclosed liabilities) and not on a future earnings (or earn-out) formula. Consequently, they feel section 483 does not apply. This "guaranteed minimum purchase price" argument is based on the terms of the reorganization agreement, which petitioners assert only utilizes a future earnings formula to compute amounts they would receive over and above the "guaranteed minimum" amount (said to be $1,800,000). Since the actual amount received was less than the "guaranteed minimum," it is argued the earnings formula was not used to compute the dollar amount of the Kidde stock received.

Finally, petitioners contend that this case comes within an exception to section 483, recognized by respondent, where deferred stock payments are held in escrow or in reserve. See Rev. Rul. 70–120, 1970–1 C.B. 124. Petitioners claim that any distinctions between their circumstances and those mentioned in the ruling are superficial and without consequence. Exhorting substance over form, they contend they should receive the same treatment afforded the taxpayer in the ruling.

Respondent counters that section 483 applies to certain deferred payments made in connection with a "sale or exchange" of property, regardless of whether that sale or exchange is entitled to nonrecognition treatment under section 354. Respondent readily admits that section 483 was intended to close a loophole arising most often in installment sales, but he contends the statute was intended to have a broader application. He bases his argument on the belief that the exceptions provided in section 483(f) were the only exceptions intended in the statute. Moreover, respondent contends that interest imputed under section 483 does not constitute "boot" which would disqualify an exchange of stock from classification as a reorganization under section 368(a)(1)(B). See sec. 1.483–2(a)(2), Income Tax Regs.

Respondent relies on his regulation-making authority in section 7805(a), and contends the questioned regulations are a valid exercise of that authority. He further asserts that the regulations have withstood the test of time and gone through successive congressional enactments of revenue laws without change in 1969, 1971, and 1975.

In addition, respondent claims he has not "created" any income in the present case nor has he discriminated against petitioners by applying section 483 to their circumstances.

As to the particular facts before us, respondent argues that it is irrelevant whether there was a "guaranteed minimum purchase price." Section 483 applies to deferred payments regardless of the definite or indefinite nature of such future payments at the time of the exchange.

Lastly, respondent argues that petitioners do not come within the provisions of Rev. Rul. 70–120, 1970–1 C.B. 124, because no escrow was created, nor were any of the benefits of ownership in the shares comprising the "second distribution" transferred to petitioners at the time of the exchange in 1964.

The parties agree that the exchange of Kidde stock for Cocker stock under the agreement of July 3, 1964, qualified as a corporate reorganization under the provisions of section 368(a)(1)(B).[5] Accordingly, nonrecognition treatment under section 354(a)[6] is appropriate.

However, section 483 provides:

(a) AMOUNT CONSTITUTING INTEREST.—For purposes of this title, in the case of any contract for the sale or exchange of property there shall be treated as interest that part of a payment to which this section applies which bears the same ratio to the amount of such payment as the total

---

[5] Sec. 368(a) provides in part:

(a) REORGANIZATION.—

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

* * *

(B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock * * *, of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation * * *

[6] Sec. 354(a) provides in part:

(a) GENERAL RULE.—

(1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

unstated interest under such contract bears to the total of the payments to which this section applies which are due under such contract.

* * *

(c) PAYMENTS TO WHICH SECTION APPLIES.—

(1) IN GENERAL.—Except as provided in subsection (f), this section shall apply to any payment on account of the sale or exchange of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange under a contract—

Since the trial and the filing of briefs in this case we have decided that section 483 can be applied to certain types of "B" reorganizations to tax a portion of the stock received as ordinary income. In *Solomon v. Commissioner,* 67 T.C. 379 (1976), we rejected many of the arguments raised by petitioners to support their claim that sections 368 and 354 take precedence over section 483. We held that the express language of section 483 is broad, reflecting a congressional intent to have section 483 apply "to *any* deferred payment received on the exchange of property under a contract in which no interest or inadequate interest is provided, irrespective of whether gain or loss is recognized on the exchange, except in those five instances specified in subsection (f)." 67 T.C. at 385. See also *Catterall v. Commissioner,* 68 T.C. 413 (1977). Cf. *Jeffers v. United States,* 556 F.2d 986 (Ct. Cl. 1977).

We do not believe the absence of a clear expression in either the statute or the legislative history that section 483 applies to tax-free reorganizations precludes such application. The statute is worded broadly with its only intended exceptions enumerated in section 483(f). *Solomon v. Commissioner, supra* at 385. We believe Congress intended section 483 to apply to tax-free reorganizations, and we reject petitioners' contention that section 1.483–2(b)(3)(i), Income Tax Regs.,[7] is invalid. *Catterall v. Commissioner, supra.* The regulation is neither unreasonable nor clearly inconsistent with the statute. *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501 (1948).

---

[7] Sec. 1.483–2(b)(3)(i), Income Tax Regs., states in part:

The provisions of section 483 apply to deferred payments of stock or securities by a corporation which is a party to a reorganization, notwithstanding that under section 354(a) no gain or loss is recognized on the transaction. * * *

Petitioners argue that no income was realized or recognized on the exchange and the Commissioner cannot "create" income through the use of section 483. This argument is in part irrelevant and in part wrong. It is irrelevant in that section 483 requires neither the realization nor recognition of gain for its application. The section applies to *payments* regardless of whether the exchange resulted in a gain or loss. H. Rept. 749, 88th Cong., 1st Sess. (1963), 1964–1 C.B. (Part 2) 198. While the purpose of the statute has been said to be to prevent the conversion of ordinary income into capital gain, *Solomon v. Commissioner, supra* at 383–384,[8] its purpose is not limited to that. The broader purpose of the statute is to prevent the conversion of interest into principal. The principal portion of any payment may represent gain to the seller, but it may also represent a return of his capital investment at either no gain or a loss.

Section 483 reflects a congressional intent to tax transactions according to substance, not form. S. Rept. 830, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 606. And in substance a portion of the deferred payments received in certain sales or exchanges represents compensation paid for the use of property during the period of deferral (i.e., interest). This interest is income within the meaning of section 61(a)(4) and is realized by petitioners when received. Neither Congress nor the Commissioner has sought to "create" income where none exists. Section 483 merely seeks to tax what in substance is interest income to sellers in deferred payment sales or exchanges.

The interest portion of these deferred payments is severable from the principal portion and is not a payment for the property exchanged. Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.56, p. 14–144 (3d ed. 1971). The interest, therefore, does not constitute "boot" which would disqualify the transaction from treatment as a reorganization under section 368(a)(1)(B). See sec. 1.483–2(a)(2), Income Tax Regs.

---

[8] See also *Jeffers v. United States*, 556 F.2d 986 (Ct. Cl. 1977).

Petitioners argue that the application of section 483 to their circumstances is discriminatory and invalid. They note that section 1.483–1(b)(1), Income Tax Regs., states:

Section 483 does not apply to a distribution in complete liquidation of a corporation, regardless of whether the corporation is liquidated in one distribution or in a series of distributions. * * *

See also Rev. Rul. 74–89, 1974–1 C.B. 125, which indicates the Commissioner will not apply section 483 to partial liquidations under section 346(a)(1). Petitioners claim their position is indistinguishable from the liquidation of a corporation and, therefore, they should be treated the same.[9]

Respondent answers that a liquidation differs from a reorganization because in the former the shareholder divests his entire interest in the corporation, but in the latter he does not. Such answer we find inadequate. To begin with, a shareholder may or may not divest himself of his entire interest in a corporation in a partial liquidation. Moreover, whether he does or not is irrelevant for section 483 because that section often applies to deferred payment sales where the seller completely divests himself of whatever it is he sold.

While we disagree with respondent's attempted justification for treating reorganizations in a manner different from liquidations, we do feel that petitioners' reorganization is sufficiently distinguishable from liquidations in general that petitioners may not obtain relief from tax under the guise of discrimination.

Speaking of liquidations and reorganizations generally is very difficult because of the myriad of transactions encompassed within those terms. All liquidations are not alike, just as all reorganizations are not alike. So too, some liquidations are identical with reorganizations for certain purposes. See *Movielab, Inc. v. United States*, 494 F.2d 693 (Ct. Cl. 1974); *Eastern Color Printing Co. v. Commissioner*, 63 T.C. 27 (1974); *Performance Systems, Inc. v. United States*, 382 F.Supp. 525 (M.D. Tenn. 1973), affd. per curiam 501 F.2d 1338 (6th Cir. 1974). Cf. *Rogan v. Starr Piano Co., Pacific Division*, 139 F.2d 671 (9th Cir. 1943), cert. denied 322 U.S. 728 (1944).

---

[9] The Court of Claims expressly left this issue undecided in *Jeffers v. United States, supra* at n. 25.

Some generalizations, however, can be made:

In general, the concept of complete liquidation envisions a final termination of the *corporate* enterprise (either through a sale of its assets to outsiders, followed by a distribution of the sale proceeds to its shareholders, or by a distribution in kind of the assets to its shareholders, so that they may either sell these properties or continue to operate the business in noncorporate form). The applicable statutory pattern for liquidations, found in §§331 to 337, provides generally for nonrecognition at the corporate level, capital gain or loss for the shareholders, and a new fair market value basis for the liquidating corporation's assets, supra Ch. 11. Reorganization, on the other hand, as noted by Regs. §1.368–1(b), involves continuity of business operation under modified corporate forms, coupled with a continuity of shareholder investment in that enterprise. In keeping with this premise, the statute provides not only for nonrecognition of gain or loss by the various parties to the reorganization exchanges, but for continuation of the tax basis for the properties involved therein and for inheritance of the acquired corporation's other tax attributes as well. Even more important, however, is the possibility of dividend income by virtue of the boot dividend provisions of §356(a)(2), a risk not present in the case of a true liquidation. [Bittker & Eustice, *supra* at par. 14.54, p. 14–122.]

Recognizing the differences between reorganizations and liquidations, Congress has adopted many different rules governing the treatment of each. See secs. 331–346 and secs. 354–368.

Under section 483 Congress has sought to tax what is, in substance, interest income. Interest has been defined as compensation for the use of borrowed money. *Deputy v. duPont,* 308 U.S. 488 (1940). The liquidating corporation, however, has not in any sense "borrowed" its shareholders' equity investment. The payment of liquidation proceeds to shareholders does not represent the satisfaction of an *indebtedness* of the liquidating corporation (such as might arise under contractual obligations in a reorganization). In the absence of such indebtedness, the Commissioner's determination not to impute interest income to the shareholders under section 483 appears to comport with the substantive economic realities of the transaction. While some reorganizations may be identical with certain liquidations, there can be no claim here that the Cocker-Kidde reorganization was in any sense the liquidation of a corporation. We believe the shareholders of a liquidating corporation are in significantly

different circumstances than petitioners, and consequently, we reject petitioners' claim of discrimination.[10]

Petitioners next contend that respondent is "estopped" from applying section 483 to a "B" reorganization by virtue of section 483(f)(3).[11] They claim that imputed interest income constitutes "boot" in a "B" reorganization and is taxable as ordinary income under section 356(a).[12] They conclude that since the only income recognized on the exchange is ordinary income, the transaction falls within the exception provided in section 483(f)(3).

Initially, we note that petitioners' argument is not an estoppel argument at all, but rather one of statutory construction. Petitioners focus only on the income imputed under section 483 and conclude that the exception provided in section 483(f)(3) applies.

We have already concluded that the stock received by petitioners representing interest income under section 483 is not "boot" under section 368 (a)(1)(B). Neither do we believe such stock is "other property or money" within the meaning

---

[10] Because we have decided there is no invidious discrimination in the case before us, we need not decide whether discrimination alone would be a ground upon which petitioners would be relieved of liability for tax. Cf. *Davis v. Commissioner*, 65 T.C. 1014, 1022 (1976). This is not a situation involving the Commissioner's exercise of discretion under sec. 7805(b). Consequently, the line of cases dealing with discrimination in that area are inapposite. See, for example, *International Business Machines Corp. v. United States*, 343 F.2d 914 (Ct. Cl. 1965).

[11] During the years in issue sec. 483(f)(3) read as follows:

(3) TREATMENT OF SELLER.—In the case of the seller, the tax treatment of any amounts received on account of the sale or exchange of property shall be made without regard to this section if no part of any gain on such sale or exchange would be considered as gain from the sale or exchange of a capital asset or property described in section 1231.

The Tax Reform Act of 1976, Pub.L. 94–455, changed the wording of the exception, for years beginning after Dec. 31, 1976, to the following:

(3) TREATMENT OF SELLER.—In the case of the seller, the tax treatment of any amounts received on account of the sale or exchange of property shall be made without regard to this section if all of the gain, if any, on such sale or exchange would be considered as ordinary income.

The change was made to conform to the additions of secs. 63 and 64 to the Code and was not intended to cause any substantive change in the law. See sec. 1901(b)(3)(B), Pub.L. 94–455. See also S. Rept. 94–938, 1976–3 C.B. (Vol. 3) 71, 529; H. Rept. 94–658, 1976–3 C.B. (Vol. 2) 13, 1064.

[12] Sec. 356(a)(2) treats a portion of the gain recognized under sec. 356(a)(1) as a dividend in certain circumstances.

of section 356(a)(1)(B).[13] Section 356 is not the operative provision which makes a portion of the stock received by petitioners taxable as ordinary income. Rather, section 483 alone makes a portion of such stock taxable as ordinary income. Petitioners' argument, therefore, is tantamount to saying that since the only income recognized on the exchange would be ordinary income in the form of interest (if section 483(a) were applied), the exception provided in section 483(f)(3) applies. We think this construction of the statute is strained.

Section 483(f)(3) does not necessarily preclude the application of section 483(a) where the only income realized (or recognized) from the transaction by the seller is ordinary income in the form of interest. To conclude otherwise would be to preclude the application of section 483(a) in every deferred payment sale resulting in a loss.

The legislative history behind section 483(f)(3) states:

in the case of the seller, this provision is to apply only if some part of the gain from the sale or exchange of the property would be considered as gain from a capital asset or as gain from depreciable property. If the property is sold at a loss, this provision will nevertheless apply if, had there been a gain, some part of it would have been considered as gain from a capital asset or from depreciable property. * * * [S. Rept. 830, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 607.]

It is clear that Congress intended section 483 to apply to loss sales as well as gain sales. Indeed, Congress has stated the determination of whether the exception in section 483(f)(3) applies (and thus whether section 483(a) applies) is to be made without regard to whether in fact a gain was realized on the exchange or whether such gain (if any) would be recognized. H. Rept. 749, 88th Cong., 1st Sess. (1963), 1964–1 C.B. (Part 2) 335. What subsection (f)(3) focuses on, apart from the character of any gain actually realized or recognized, is the asset sold or exchanged. Subsection (f)(3) seeks to have section 483(a) apply (in the case of sellers) only to sales or exchanges of capital assets or property described in section 1231. We do

---

[13] Cf. *Hamrick v. Commissioner*, 43 T.C. 21 (1964), and *Carlberg v. United States*, 281 F.2d 507 (8th Cir. 1960), which held conditional rights to receive additional shares of stock were not "other property" under sec. 351(b) or 356(a)(1), respectively. Nothing said in this opinion is inconsistent with either of these cases. See *Catterall v. Commissioner*, 68 T.C. 413 (1977).

not find it significant that the only income recognized by petitioners on the exchange in question is ordinary income in the form of interest. Nothing in the record suggests that the Cocker stock in their hands was anything other than a capital asset, and accordingly, the exception provided in section 483(f)(3) is inapplicable to the facts of this case.[14]

In addition, we believe the commonsense understanding of section 483(f)(3) is that it refers to gain, if any, occurring on the exchange before section 483(a) is applied, not after. This follows from the wording of the exception itself which precludes the application of section 483(a) in the first instance, and does not purport to deal with the consequences flowing from the section's application.

We conclude, therefore, that the Commissioner is not precluded from applying section 483(a) to the facts of this case by section 354, 356, 368, or 483(f)(3).

Petitioners contend that even if section 483 applies to future payments in certain reorganizations, it does not apply to their particular circumstances. They point out that the regulations and revenue rulings dealing with this subject only involve situations where the delayed payments are based on future earnings.[15]

It will be helpful to delve into the wording of the reorganization agreement in order to resolve the remaining disputes herein. Paragraphs 2.2(a) and (b) of the agreement base the computation of the "second distribution" on the earnings of Cocker subsequent to the date of the reorganization. But paragraph 2.2(c) indicates that if the figure arrived at under paragraphs 2.2(a) and (b) when added to the amount

---

[14] We have no idea whether any gain was actually realized on the exchange because petitioners' bases in their Cocker stock do not appear in the record.

[15] In S. Rept. 830, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 607, the Senate Finance Committee stated:

"Where, at the time of the sale or exchange, some or all of the payments are indefinite as to their size; for example where the payments are in part at least dependent upon future income derived from the property, the 'unstated' interest for purposes of this provision will be determined separately with respect to each indefinite payment as it is received, taking into account the time interval between the sale or exchange and the receipt of the payment. Also, where there is a change in the amount due under a contract, the 'unstated' interest is to be recomputed at the time of each such change."

This provision was taken verbatim from H. Rept. 749, 88th Cong., 1st Sess. (1963), 1964–1 C.B. (Part 2) 197.

of the "first distribution" totals less than $1,800,000, then this latter figure ($1,800,000) is to be used as a base amount. The applicable base figure arrived at must then be reduced by certain "liabilities and claims" provided for in paragraph 2.2(d), subject to the "floor" limitation in paragraph 2.2(d)(i) which will be discussed later.

Petitioners argue rather vigorously that because the aggregate value of stock distributions was $1,745,269.25, the future earnings of Cocker played no part in the computation and, therefore, section 483 does not apply.

We find it unnecessary to determine whether the "second distribution" received by petitioners was in any way based on the future earnings of Cocker. Section 483 does not apply only to "earn-out" situations. The examples in the regulations and legislative history dealing with future earnings are simply examples. They were not intended to be exclusive. *Solomon v. Commissioner, supra* at 386. In *Solomon,* section 483 was applied to delayed stock payments which were contingent on the value of the acquiring corporation's stock at a future date.

Section 483(d)[16] indicates that section 483 applies to payments "which the liability for, or the amount or due date of * * * cannot be determined at the time of the sale or exchange." The $1,800,000 figure relied on by petitioners as a "guaranteed minimum purchase price" was in no sense a floor below which the total amount of the first and second distributions could not go. Paragraph 2.2(d) of the agreement allows a reduction of the $1,800,000 figure for certain "claims and liabilities." There is no indication in the record that these "claims and liabilities" could be determined at the date of the exchange in 1964, and consequently, we believe the amount of the "second distribution" could not be determined within the meaning of section 483(d).

We qualify this last statement somewhat because we do think a portion of the "second distribution" (though not as much as petitioners have suggested) could be determined at

---

[16] Sec. 483(d) reads as follows:

PAYMENTS THAT ARE INDEFINITE AS TO TIME, LIABILITY, OR AMOUNT.—In the case of a contract for the sale or exchange of property under which the liability for, or the amount or due date of, any portion of a payment cannot be determined at the time of the sale or exchange, this section shall be separately applied to such portion as if it (and any amount of interest attributable to such portion) were the only payments due under the contract; and such determinations of liability, amount, and due date shall be made at the time payment of such portion is made.

the time of the exchange. Paragraph 2.2(d)(i) of the agreement states that in "no event" will the "claims and liabilities" reduce the amount of the "second distribution" to less than the difference between the stockholder equity shown on the Cocker Balance Sheet on July 3, 1964 ($1,410,498), and $1,500,000. Accordingly, $89,502 of the "second distribution" was fixed at the time of the exchange in 1964.

However, establishing a "minimum guaranteed" or fixed amount does not preclude the application of section 483. Indeed, in a typical installment sale the total amount to be paid under the contract is often "guaranteed" in the sense that it is fixed and definite. It is apparent from reading the statute and its legislative history that Congress intended section 483 to apply to deferred payments regardless of whether the amount of or liability for such payments could be determined at the time of the exchange. Accordingly, even though a portion of the "second distribution" was fixed and determinable at the time of the exchange, section 483 applies to the entire amount of this "second distribution." The only significance in deciding that a portion of the deferred payments is definite and a portion indefinite lies in the method of computation of the interest. See sec. 1.483–1(e)(1) and (3), example (1), Income Tax Regs.; H. Rept. 749, 88th Cong., 1st Sess. (1963), 1964–1 C.B. (Part 2) 334. Because the Commissioner did not compute interest income in his notices of deficiency using the figures we have established for definite and indefinite payments, a computation under Rule 155, Tax Court Rules of Practice and Procedure, is necessary.

Petitioners' last argument is that their situation is comparable to Rev. Rul. 70–120, 1970–1 C.B. 124, and accordingly section 483 does not apply. Rev. Rul. 70–120 indicates that where delayed payments are placed in escrow at the time of the exchange in a "B" reorganization, section 483 will not be applied. Petitioners claim that a reserve was established for the future shares of Kidde stock to be distributed under the reorganization agreement and such reserve should be treated the same as the escrow account referred to in the ruling.

Without passing on the validity of the ruling, we conclude that petitioners do not come within its provisions. The theory implicit in the ruling is that placing a portion of the shares in escrow is the equivalent of a "payment" under section 483.

See sec. 1.483–1(b)(6), example (8), Income Tax Regs. In such circumstances there are no deferred payments as described in section 483(c).

The significant factors present in the ruling and absent in our case are the rights of the former shareholders of the acquired corporation to vote the stock of the acquiring corporation placed in escrow and receive any dividends paid thereon. The transfer into escrow shifted at least some of the economic benefits of ownership to these shareholders. Petitioners, however, have failed to show they received any economic benefits of ownership in the Kidde stock distributed under the "second distribution" at the time of the exchange in 1964, and accordingly, we conclude that Rev. Rul. 70–120 is not applicable to the facts of this case.

For the foregoing reasons, we believe that the payments of Kidde stock received by petitioners under the "second distribution" specified in the reorganization agreement (which comprised two actual distributions of stock) are subject to the imputed interest provisions of section 483.

*Decisions will be entered under Rule 155.*