Walter F. VORBLESKI and Florence Vorbleski, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

No. 78–1154.

United States Court of Appeals, Third Circuit.

Argued Sept. 7, 1978.

Decided Dec. 1, 1978.

David E. Wasserstrom, Michael A. Bloom, Wasserstrom & Chucas, Philadelphia, Pa., for appellants.

M. Carr Ferguson, Gilbert E. Andrews, Gary R. Allen, Thomas M. Walsh, Jonathan S. Cohen, Tax Div., Dept. of Justice, Washington, D. C., for appellee.

Before GIBBONS, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

Section 483 of the Internal Revenue Code of 1954 is a general provision which treats as interest a certain part of "any payment" due more than six months after, and which is made on account of, the sale or exchange of property. In *Fox v. United States*, 510 F.2d 1330 (3d Cir. 1975), this Court held that section 483, despite its seemingly long reach, nevertheless does not apply to deferred payments made in satisfaction of a divorce property settlement because Congress intended the tax treatment of such payments to be governed exclusively by two other sections of the Code. Primarily relying on the rationale of *Fox*, appellants in this case ask us to rule that section 483 is also inapplicable to deferred payments of stock received pursuant to a stock for stock corporate reorganization.

## FACTS

Appellants Walter F. and Florence Vorbleski owned one-third of the stock of Berwick Forge and Fabricating Corporation (Berwick). On April 15, 1968, the stockholders of Berwick entered into an Acquisition Agreement and Plan of Reorganization (Agreement) with Whittaker Corporation (Whittaker). The Agreement called for the acquisition of all Berwick stock by Whittaker solely in exchange for Whittaker voting common stock. Under the terms of the Agreement, the Berwick shareholders immediately received 115,000 shares of Whittaker $1.00 par value common stock.

The Agreement also required Whittaker to reserve for possible future delivery to the Berwick shareholders 113,300 additional shares. These reserve shares were divided into two equal accounts, reserve A and reserve B. The reserve A shares were to be distributed, if at all, over the first three adjustment years after the acquisition; whether the stock was to be delivered, and the amount to be delivered, was to depend on the extent of Berwick's profits in the years ending October 31, 1968, October 31, 1969, and October 31, 1970. In addition, if at least 100 reserve A shares were delivered to the Berwick shareholders, and if the total market value of all the Whittaker common stock received by the Berwick shareholders, including the reserve A stock distributed, was less than 4½ times the average annual Berwick profits for the three adjustment years ending October 31, 1970, then Whittaker was required to deliver a certain number of reserve B shares. The amount of reserve B shares to be distributed was to be the amount necessary to make the total market value of all shares delivered by Whittaker, including those A and B shares distributed, equal to 4½ times the average annual Berwick profits for the three adjustment years.

By 1971, the extent of Berwick's profits and the deteriorating market value of Whittaker common stock caused Whittaker to deliver all of the reserve A and B shares to the Berwick shareholders. On February 17, 1971, appellants and the other Berwick owners each received 48,625 shares of Whittaker common stock from the A and B reserves, the amount to which they were entitled under the Agreement, as adjusted by stock splits and stock dividends. The shares had a per share value of $9.625 on that date.

The Berwick-Whittaker reorganization qualified as a "Type B" reorganization pursuant to section 368(a)(1)(B).[1] As a result, under section 354(a)(1),[2] no gain was recognized with respect to any of the exchanges of stock, including the distribution of the reserve stock, made in connection with the reorganization. Assuming that section 354(a)(1) thus meant that the reorganization was entirely non-taxable, appellants did not pay any federal income tax with respect to the Whittaker stock they received in the reorganization.

The Commissioner of Internal Revenue did not dispute that Whittaker's acquisition of Berwick constituted a "Type B" reorganization, or that gain from the reorganization could not be recognized. Nor did he contest the fact that the Agreement did not provide for the payment of interest by Whittaker on the reserve shares. Nevertheless, the Commissioner concluded that a part of the reserved shares received by appellants in 1971 constituted unstated interest, which is taxable as ordinary income under section 483 of the Code.[3] The Com-

---

**1.** § 368. *Definitions Relating to Corporate Reorganizations*

    (a) *Reorganization* —

        (1) *In General*—For purposes of parts I and II and this part, the term "reorganization" means—

        \*    \*    \*    \*    \*    \*

        (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition).

**2.** § 354. *Exchanges of Stock and Securities in Certain Reorganizations*

    (a) *General Rule* —

        (1) *In General*

    No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

**3.** § 483. *Interest on Certain Deferred Payments*

    (a) *Amount Constituting Interest*

    For purposes of this title, in the case of any contract for the sale or exchange of property there shall be treated as interest that part of a payment to which this section applies which bears the same ratio to the amount of such payment as the total unstated interest under such contract bears to the total of the payments to which this section applies which are due under such contract.

    (b) *Total Unstated Interest*

    For purposes of this section, the term "total unstated interest" means, with respect to a contract for the sale or exchange of property, an amount equal to the excess of—

        (1) the sum of the payments to which this section applies which are due under the contract, over

        (2) the sum of the present values of such payments and the present values of any interest payments due under the contract.

    For purposes of paragraph (2), the present value of a payment shall be determined, as of the date of the sale or exchange, by discounting such payment at the rate, and in the manner, provided in regulations prescribed by the Secretary. Such regulations shall provide for discounting on the basis of 6-month brackets and shall provide that the present value of any interest payment due not more than 6 months after the date of the sale or exchange is an amount equal to 100 percent of such payment.

    (c) *Payments to Which Section Applies*

        (1) *In General*

    Except as provided in subsection (f), this section shall apply to any payment on account of the sale or exchange of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange under a contract—

        (A) under which some or all of the payments are due more than one year after the date of such sale or exchange and

        (B) under which, using a rate provided by regulations prescribed by the Secretary for

missioner then determined a deficiency of $29,228.56 in appellants' 1971 taxable year federal income tax payment.

Appellants challenged the Commissioner's ruling in the United States Tax Court, contending that section 483 did not apply to deferred payments made in the course of corporate reorganizations governed by sections 354(a)(1) and 368(a)(1)(B) of the Code. The Tax Court rejected appellants' argument and affirmed the Commissioner's ruling.[4] Appellants bring this appeal to challenge the Tax Court's decision.

## I

Section 483 is an apparently far-reaching provision which applies, with certain specific exceptions not relevant here, *see* § 483(f),

"to *any payment* on account of the sale or exchange of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange." § 483(c)(1) (emphasis added). Once it is determined that a "payment" is covered by section 483, a specified part of that payment is treated as interest, § 483(a), which is taxable as ordinary income to the recipient of the payment.

In considering appellants' request that we hold section 483 inapplicable to deferred payments received in the course of a corporate reorganization controlled by sections 354(a)(1) and 368(a)(1)(B) of the Code, despite the broad language of section 483, we are mindful that precisely this question has been resolved in the Commissioner's favor in numerous other forums. The Treasury

purposes of this subparagraph, there is total unstated interest.

Any rate prescribed for determining whether there is total unstated interest for purposes of subparagraph (B) shall be at least one percentage point lower than the rate prescribed for purposes of subsection (b)(2).

(2) *Treatment of Evidence of Indebtedness*

For purposes of this section, an evidence of indebtedness of the purchaser given in consideration for the sale or exchange of property shall not be considered a payment, and any payment due under such evidence of indebtedness shall be treated as due under the contract for the sale or exchange.

(d) *Payments That Are Indefinite as to Time, Liability, or Amount*

In the case of a contract for the sale or exchange of property under which the liability for, or the amount or due date of, any portion of a payment cannot be determined at the time of the sale or exchange, this section shall be separately applied to such portion as if it (and any amount of interest attributable to such portion) were the only payments due under the contract; and such determinations of liability, amount, and due date shall be made at the time payment of such portion is made.

(e) *Change in Terms of Contract*

If the liability for, or the amount or due date of, any payment (including interest) under a contract for the sale or exchange of property is changed, the "total unstated interest" under the contract shall be recomputed and allocated (with adjustment for prior interest (including unstated interest) payments) under regulations prescribed by the Secretary.

(f) *Exceptions and Limitations*

(1) *Sales Price of $3,000 or Less*

This section shall not apply to any payment on account of the sale or exchange of property if it can be determined at the time of such sale or exchange that the sales price cannot exceed $3,000.

(2) *Carrying Charges*

In the case of the purchaser, the tax treatment of amounts paid on account of the sale or exchange of property shall be made without regard to this section if any such amounts are treated under section 163(b) as if they included interest.

(3) *Treatment of Seller*

In the case of the seller, the tax treatment of any amounts received on account of the sale or exchange of property shall be made without regard to this section if all of the gain, if any, on such sale or exchange would be considered as ordinary income.

(4) *Sales or Exchanges of Patents*

This section shall not apply to any payments made pursuant to a transfer described in section 1235(a) (relating to sale or exchange of patents).

(5) *Annuities*

This section shall not apply to any amount the liability for which depends in whole or in part on the life expectancy of one or more individuals and which constitutes an amount received as an annuity to which section 72 applies.

26 U.S.C. § 483 (1976).

**4.** *Catterall v. Commissioner*, 68 T.C. 413 (1977). The Vorbleskis' challenge to the Commissioner's notice of deficiency was consolidated with challenges by the other Berwick shareholders, including Alfred H. Catterall, Sr., and Dorothy Catterall. Only the Vorbleskis appealed from the decision of the Trial Court affirming the Commissioner's ruling as to all petitioners.

Department's Regulation 1.483–2(b)(3)(i)[5] states that "the provisions of section 483 apply to deferred payments of stock or securities by a corporation which is a party to a reorganization, *notwithstanding that under section 354(a) no gain or loss is recognized on the transaction*" (emphasis added). Treasury Regulations are "contemporaneous constructions by those charged with administration of" the tax laws and are to be "sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Bingler v. Johnson*, 394 U.S. 741, 749–50, 89 S.Ct. 1439, 1445, 22 L.Ed.2d 695 (1969); *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831 (1948). Moreover, the Second and Sixth Circuits and the Court of Claims have considered cases factually indistinguishable from this one and have held that section 483 applies to deferred payments made pursuant to reorganizations in which gain is not recognized. *See Katkin v. Commissioner*, 570 F.2d 139 (6th Cir. 1978); *Solomon v. Commissioner*, 570 F.2d 28 (2d Cir. 1977); *Jeffers v. United States*, 556 F.2d 986 (Ct. Cl.1977).

Appellants admit that if we are to find in their favor, we must invalidate Treasury Regulation 1.483–2(b)(3)(i) and reject the rationale of *Katkin, Solomon,* and *Jeffers.* Appellants nevertheless advance several related contentions which they assert compel us to take those steps. First, they argue that there was no "payment" due more than six months after a sale or exchange, as required by section 483, because appellants'

"payment" was received at the time of the initial stock for stock exchange in 1968. Second, they claim that section 483 is inconsistent with Code sections 354(a)(1), 358(a)(1), 368(a)(1)(B), and 1223(1). Because section 483 is a general provision and the other provisions are more specific, they reason that the other provisions must take precedence under the doctrine of *Bulova Watch Co. v. United States*, 365 U.S. 753, 758, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961), and *Fox v. United States*, 510 F.2d 1330 (3d Cir. 1975). Third, they maintain that application of section 483 to the reserved share payments received by appellants is inconsistent with the intent of Congress in extending the benefits of non-recognition of gain treatment to contingent stock reorganizations.

None of these arguments persuades us that Treasury Regulation 1.483–2(b)(3)(i) and the Commissioner's resulting notice of deficiency to appellants are "unreasonable and plainly inconsistent" with the intent of Congress in enacting section 483. *Bingler*, 394 U.S. at 749–50, 89 S.Ct. 1439; *South Texas Lumber Co.*, 333 U.S. at 501, 68 S.Ct. 695. Therefore, we affirm.

II

■ Appellants first contend that the reserved shares are not within the reach of section 483 because no "payment . . . due more than 6 months after the date of [a] sale or exchange" of property took place as required by section 483(c)(1). Appel-

---

5. 26 C.F.R. § 1.483–2(b)(3)(i) (1977). That subsection states in its entirety:

> (3) *Capital asset or section 1231 property* —(i) *Treatment of seller,* In case of the seller, the determination of the tax treatment of any amounts received on account of the sale or exchange of property shall be made without regard to section 483 if no part of any gain on such sale or exchange would (if the property were sold at a gain) be considered as gain from the sale or exchange of a capital asset or property described in section 1231 (relating to property used in the trade or business and involuntary conversions). The determination of whether the exception of the preceding sentence applies shall be made without regard to whether any gain or loss is realized on the sale or exchange, whether any

> realized gain or loss would be recognized, or whether some other provision of law, such as section 1245 (relating to gain from dispositions of certain depreciable property) or section 1250 (relating to gain from dispositions of certain depreciable realty) applies, or would apply, to some or all of the gain. For example, the provisions of section 483 apply to deferred payments of stock or securities by a corporation which is a party to a reorganization, notwithstanding that under section 354(a) no gain or loss is recognized on the transaction. Similarly, the provisions of section 483 apply to deferred payments made to a corporation for its stock, notwithstanding the nonrecognition of gain or loss to the corporation under section 1032 (relating to exchange of stock for property).

lants' version of the 1968 Agreement with Whittaker is that appellants exchanged their equity interest in Berwick for an equity interest in Whittaker equal in value to the interest they surrendered. Because the parties were unable to agree on the specific dollar value of Berwick, part of appellants' equity interest in Whittaker was to be represented by Whittaker common stock and part was to consist of a non-assignable right to receive additional Whittaker common stock, the amount of which depended on the occurrence of certain circumstances beyond appellants' control. Appellants assert that the contingent right to equity ownership in Whittaker granted them by the 1968 Agreement served the same function as actual possession of the reserved shares, in that both represented ownership by appellants of part of Whittaker. Thus, appellants claim that for purposes of section 483, "payment" occurred in 1968 when they were granted the non-assignable "right" to the reserve shares; the delivery of the shares in 1971 was only a change in the form of appellants' equity interest in Whittaker, not in its substance.

Appellants' interpretation of what constitutes a section 483 "payment" is by no means novel; it has been considered and rejected by all three courts that have addressed it. See *Solomon*, 570 F.2d at 34; *Katkin, id.* at 142; *Jeffers*, 556 F.2d at 997. In our view, the delivery of the reserved shares in 1971 was a section 483 "payment" within the plain meaning of that word; the granting of the "right" to receive additional shares in 1968 was not. Black's Law Dictionary (rev. 4th ed. 1968) defines "payment" as "[t]he fulfilment of a promise, or the performance of an agreement," and as "[a] discharge of an obligation or debt." *Id.* at 1285. Whittaker's delivery of the reserved shares discharged its obligation and fulfilled its contractual promise to appellants. See *Katkin*, 570 F.2d at 142. On the other hand, the mere granting of a contingent "right" to appellants did not satisfy Whittaker's obligation. If, when appellants' contingent right to the reserved shares vested, Whittaker had failed to deliver the shares, it could hardly be argued

that Whittaker had nonetheless fulfilled its part of the bargain.

Moreover, we cannot accept appellants' claim that the contingent "right" to the reserve shares is substantively identical to possession of the shares. As the Second Circuit noted in *Solomon*, appellants, prior to delivery of the reserved shares, "had few of the rights and liabilities normally associated with the ownership of [those] shares. They could neither vote them nor receive dividends payable on them (nor were they liable for taxes on those dividends)." 570 F.2d at 34. Thus, we conclude that "payment" with respect to the reserve shares occurred in 1971, more than six months after the reorganization took place.

Appellants maintain, however, that unless we rule that the section 483 "payment" took place in 1968 rather than in 1971, our decision will be inconsistent with *Carlberg v. United States*, 281 F.2d 507 (8th Cir. 1960). The issue in *Carlberg* was whether a "Certificate of Contingent Interest" representing a conditional right to receive additional shares of stock in the future constituted "stock" in the context of section 354(a)(1) or "other property" within the meaning of section 356(a)(1)(B). If the Certificates were "stock", then no gain from the reorganization would be recognized pursuant to section 354(a)(1). If the Certificates were "other property," then gain, to the extent of "boot," resulting from the reorganization would be taxable under section 356(a)(1).

In holding that the certificates were section 354(a)(1) "stock," the Eighth Circuit stated:

We emphasize also that, however one may choose to describe it, the Certificate of Contingent Interest represented only [common stock] and nothing else. What the holder possessed was either stock or it was nothing. The number of shares to be forthcoming, it is true, was not determined with exactitude at the time of the merger but that fact does not change the character of the interest.

281 F.2d at 519. Appellants in this case contend that *Carlberg* stands for the principle that contingent rights [6] to additional shares of stock granted a party to a corporate reorganization are in substance identical to possession of those shares. Appellants therefore claim that because no substantive difference exists between their contingent interest in Whittaker stock and their receipt of the actual reserved shares, we cannot, unless we choose to reject *Carlberg,* hold that "payment" was not made, in the context of section 483, until 1971.

Appellants, we believe, read *Carlberg* out of context. Initially, we note that *Carlberg* did not purport to define "payment" under section 483; in fact, that provision had not even been adopted when *Carlberg* was decided. Moreover, *Carlberg* has been found inapposite in each of the cases examining the application of section 483 to reorganizations governed by section 354(a)(1). *See Katkin,* 570 F.2d at 142–43; *Solomon, id.* at 34–36; *Jeffers,* 556 F.2d at 996–97. The issue facing the Eighth Circuit in *Carlberg* was whether or not *gain* resulting from a reorganization in which one party was given, in part, contingent rights to receive additional shares of stock was taxable. The sections of the Code providing that gain from some forms of corporate reorganization is not recognized for tax purposes are founded on the assumption that *"certain specifically described exchanges* incident to . . . readjustments of corporate structures made in one of the particular ways specified in the Code . . . are required by business exigencies and . . . effect only a readjustment of continuing interest in property under modified corporate forms."* Treas.Reg. § 1.368–1(b) (emphasis added); *see Groman v. Commissioner,* 302 U.S. 82, 89, 58 S.Ct. 108, 82 L.Ed. 63

(1937); *King Enterprises, Inc. v. United States,* 418 F.2d 511, 515, 189 Ct.Cl. 466 (1969).

When shares of stock are the media of exchange in a corporate reorganization, sufficient continuity of interest exists so that any gain resulting from the exchanges of stock is not recognized. *See* Section 354(a)(1). Thus, in ruling that gain resulting from the reorganization in *Carlberg* was not taxable, all that the Eighth Circuit held was that the continuity of the taxpayer's interest in property represented by a modified corporate form was not lost merely because the taxpayer received part shares of stock and part contingent rights to additional stock in exchange for his own stock.[7]

In this context, the *Carlberg* court's statement that the taxpayer's contingent interest "was either stock or it was nothing," upon which appellants in this case rely so heavily, is completely unrelated to the issue involved in this appeal. What the court appears to have meant is that the taxpayer's contingent right to additional shares would eventually result either in the delivery of shares of stock to the taxpayer, if the necessary conditions precedent took place, or in the delivery of no additional property of any kind to him, if the conditions precedent did not occur. In either case, the taxpayer ultimately would receive only shares of stock in exchange for the stock which he gave up; a continuity of interest would thus be present and the reorganization would be governed by section 354(a)(1).

*Carlberg* is therefore not relevant to the case at bar. The reason that a contingent right to additional shares constitutes section 354(a)(1) "stock" is because the taxpayer will receive nothing but shares of stock in

---

6. In *Carlberg,* the taxpayer was given formal certificates to evidence his contingent right to additional stock. No such certificates were created in the case at bar. Appellants assert, and we agree, that the presence or absence of formal certificates is irrelevant to a determination of whether "payment" has been made under section 483. *See James C. Hamrick,* 43 T.C. 21 (1964).

7. "[T]he Certificates here provide 'continuity of interest' in the surviving corporation just as do the taxpayer's whole shares and fractional share. The Certificates can produce nothing other than stock and nothing other than a continuity of interest. The Certificates therefore fit the expressed basic purpose of the tax free provisions of the reorganization sections." 281 F.2d at 519.

exchange for the shares he has relinquished. Section 483, however, is concerned not with *what* the taxpayer will ultimately receive, but with *when* he received it. *See Jeffers,* 556 F.2d at 996. Notwithstanding that the reserved shares at all times constituted "stock" under section 354(a)(1), we hold that appellant did not receive "payment" of the reserve shares until they were delivered. Nothing in *Carlberg* contradicts this holding.[8]

### III

Appellants' second contention is that even if the word "payment" in section 483 would otherwise encompass their receipt of the reserved shares of Whittaker, an extension of section 483 to cover a deferred transfer of stock in the course of a corporate reorganization governed by Code sections 368(a)(1)(B)[9] and 354(a)(1)[10] is barred by our holding in *Fox v. United States,* 510 F.2d 1330 (3d Cir. 1975). In attempting to persuade this Court to invoke *Fox,* appellants assert two syllogisms. The first syllogism is: (1) Under section 354(a)(1), a stock for stock exchange pursuant to a corporate reorganization, as defined by section 368(a)(1)(B), is treated as a non-taxable event; (2) The Berwick-Whittaker reorganization is governed by section 354(a)(1); (3) Section 483, if applied to the Berwick-Whittaker reorganization, taxes a certain part of the stock for stock exchange, and is therefore inconsistent with section 354(a)(1); (4) Under *Fox,* section 483 is a general provision that is superseded by inconsistent provisions of the Code which, like section 354(a)(1), are more narrowly drawn.

The second syllogism is: (1) Under section 1223(1),[11] the period for which a "taxpayer has held property received in an exchange," *id.,* shall include the period for which he held the property given up in the exchange, if the property received has the same basis in whole or in part as the property relinquished; (2) Section 358(a)(1)[12] provides that property received in a section 354(a)(1) reorganization has the same basis as the property relinquished; (3) Thus, the result of section 1223(1) is that appellants held their reserved shares of Whittaker even before the 1968 exchange of shares took place; (4) Section 483 provides that appellants did not receive their reserved shares until they were delivered in 1971; (5) Section 483 is therefore inconsistent with section 1223(1), and inapplicable because of *Fox.*

### A.

The *Fox* case, which appellants vigorously argue controls our disposition of their appeal, involved a conflict between section 483 and Code sections 71[13] and

---

**8.** *See Solomon, supra,* at 35.

**9.** *See* note 1 *supra.*

**10.** *See* note 2 *supra.*

**11.** Section 1223(1) states:

§ 1223. *Holding Period of Property*
For purposes of this subtitle—
(1) In determining the period for which the taxpayer has held property received in an exchange, there shall be included the period for which he held the property exchanged if, under this chapter, the property has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as the property exchanged, and, in the case of such exchanges after March 1, 1954, the property exchanged at the time of such exchange was a capital asset as defined in section 1221 or property described in section 1231.

**12.** Section 358(a)(1) provides:

§ 358. *Basis to Distributees*
(a) *General Rule*
In the case of an exchange to which section 351, 354, 355, 356, 361, 371(b), or 374 applies—
(1) *Nonrecognition Property*
The basis of the property permitted to be received under such section without the recognition of gain or loss shall be the same as that of the property exchanged. . . .

**13.** Section 71 states in pertinent part:

§ 71. *Alimony and Separate Maintenance Payments*
(a) *General Rule*
(1) *Decree of Divorce or Separate Maintenance*
If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals received after such decree in discharge of (or attributa-

215,[14] which determine the tax treatment of payments made pursuant to a divorce related property settlement. Fox and his wife had agreed to a divorce and had entered into a written agreement dividing their securities and their personal and real property. Under the agreement, Fox was to pay $1,000,000 in cash to his wife; $300,000 was payable immediately after the divorce decree was entered and the remainder was payable in quarterly installments for a period of nine and one-half years. Fox claimed that his installment payments were deferred "payments" under section 483, so that a certain part of those payments constituted interest, which is a deductible expense. Fox's theory, however, ran head-on into sections 71 and 215.

Section 71(a)(1) of the Code states the general rule that "periodic payments" received by a wife "in discharge of . . . a legal obligation . . . incurred by the husband under the decree [of divorce] or under a written instrument incident to [the] divorce," are included in the wife's gross income. Section 71(c)(1) excepts from this general rule installment payments, such as Fox's, "discharging a part of an obligation the principal sum of which is . . . specified in the [divorce] decree, instrument, or agreement." The section 71(c)(1) exception does not apply, however, when the installment period is greater than 10 years. § 71(c)(2). The result of these three provisions is that Fox's installment payments to his wife, which were for a

ble to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation.

(2) *Written Separation Agreement*

If a wife is separated from her husband and there is a written separation agreement executed after the date of the enactment of this title, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such agreement is executed which are made under such agreement and because of the marital or family relationship (or which are attributable to property transferred, in trust or otherwise, under such agreement and because of such relationship). This paragraph shall not apply if the husband and wife make a single return jointly.

(3) *Decree for Support*

If a wife is separated from her husband, the wife's gross income includes periodic payments (whether or not made at regular intervals) received by her after the date of the enactment of this title from her husband under a decree entered after March 1, 1954, requiring the husband to make the payments for her support or maintenance. This paragraph shall not apply if the husband and wife make a single return jointly.

.    .    .    .    .

(c) *Principal Sum Paid in Installments*

(1) *General Rule*

For purposes of subsection (a), installment payments discharging a part of an obligation the principal sum of which is, either in terms of money or property, specified in the decree, instrument, or agreement shall not be treated as periodic payments.

(2) *Where Period for Payment Is More Than 10 Years*

If, by the terms of the decree, instrument, or agreement, the principal sum referred to in paragraph (1) is to be paid or may be paid over a period ending more than 10 years from the date of such decree, instrument, or agreement, then (notwithstanding paragraph (1)) the installment payments shall be treated as periodic payments for purposes of subsection (a), but (in the case of any one taxable year of the wife) only to the extent of 10 percent of the principal sum. For purposes of the preceding sentence, the part of any principal sum which is allocable to a period after the taxable year of the wife in which it is received shall be treated as an installment payment for the taxable year in which it is received.

(d) *Rule for Husband in Case of Transferred Property*

The husband's gross income does not include amounts received which, under subsection (a), are (1) includible in the gross income of the wife, and (2) attributable to transferred property.

**14.** Section 215 provides:

§ 215. *Alimony, Etc., Payments*

(a) *General Rule*

In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year. No deduction shall be allowed under the preceding sentence with respect to any payment if, by reason of section 71(d) or 682, the amount thereof is not includible in the husband's gross income.

period of less than 10 years, did not constitute gross income to the wife. Section 215 states categorically the corollary to section 71: "In the case of a husband described in section 71, there shall be allowed as a deduction *amounts includible under section 71 in the gross income of his wife*" (emphasis added). Because no gross income to Fox's wife resulted from the payments, Fox's deduction was explicitly forbidden by section 215, the provision Congress "enacted to cover the precise factual complex present in the Fox settlement agreement." 510 F.2d at 1333.

We read *Fox* as standing only for the narrow rule that section 483 does not apply to a payment when Congress intended all of the tax consequences of that payment to be governed *exclusively* by another provision of the Code. Because we conclude that Congress did not intend for sections 354(a)(1), 368(a)(1)(B), 358(a)(1), and 1223(1) to determine *all* the tax consequences of stock for stock corporate reorganizations, *Fox* is not on point.

Sections 354(a)(1) and 368(a)(1)(B), which appellants frequently refer to as the "tax free" reorganization provisions of the Code, do not provide that participants in a reorganization qualifying under section 354(a)(1) shall suffer no tax consequences in the course of a purely stock for stock exchange. Rather, section 354(a)(1) states that "[n]o gain or loss shall be recognized" (emphasis added). Section 483 does not, however, purport to tax any gain arising out of appellants' participation in the Berwick-Whittaker reorganization. Instead, section 483 is directed toward the interest component which that section and Treasury Regulation 1.483–2(b)(3)(i) state was received by appellants when they took possession of the reserved stock. We cannot say that by using the "[n]o gain or loss" language, Congress intended to make stock for stock reorganizations entirely tax free. To the contrary, sections 61(a)(3) and 61(a)(4) of the Code list "[g]ains derived from dealings in property" and "[i]nterest" as separate items of gross income. Congress was well aware that "gain" and "gross income" are not coextensive; had it intended section 354(a)(1) to prevent *any* adverse tax consequences from arising out of stock for stock reorganizations, it would have said so. *See Katkin*, 570 F.2d at 143; *Solomon, id.* at 36.[15]

### B.

We likewise do not find section 483 to be irreconcilable with section 1223(1). The latter provision, read in conjunction with section 358(a)(1), states that a taxpayer is deemed to have held "property received in an exchange", if the exchange is one in which gain is not recognized, from the time that he acquired the property which he relinquished in the exchange. If *all* the Whittaker reserved shares constituted "property received in an exchange," there would appear to be an inconsistency between sections 1223(1) and 483 because, as we have interpreted section 483, the reserve shares were not received by appellants in "payment" until they were actually delivered.

The government contends, however, that there were in effect two "types" of reserved Whittaker shares: those that were received by appellants as a capital asset, which the Commissioner did not attempt to tax, and those that were considered to be interest, which were taxed pursuant to section 483. The government claims that those shares which constituted interest were not "property received in an ex-

---

**15.** In their brief, appellants argue that there is no evidence that Congress intended section 483 to "override" the reorganization provisions of the Code. Appellants note that section 1250(i) of the Code, which was part of the same revenue bill as section 483, and section 1245(d), which was passed two years earlier, both stated that they "shall apply notwithstanding any other provision of this subtitle." No such override clause exists in section 483; appellants reason that if that section was meant to supersede the reorganization provisions, Congress would have so indicated. In our view, the presence of an override clause could only be probative of congressional intent if there were an inconsistency between section 483 and other parts of the Code. Because we find no inconsistency, we do not find the absence of an override clause relevant.

change," and were thus not affected by the holding period rule of section 1223(1). The government's distinction between sections 483 and 1223(1) was accepted in *Solomon,* 570 F.2d at 36–37, and in *John Cocker, III,* 68 T.C. 544 (1977). We agree that the reserve shares deemed to be interchange."

Our view that section 1223(1) is not controlling is based on the legislative history to section 483. The so-called "tacking-on" provision of section 1223(1) relied on by appellants applies to any exchange in which the property received has the same basis in whole or in part as the property relinquished. Section 358(a)(1) provides that whenever property is exchanged and the gain resulting from the exchange is not recognized, the property received is deemed to have such a "carry-over" basis. Thus, the section 1223(1) holding period would appear to be applicable, at least in some respects, to any exchange in which gain is not recognized.

If, as appellants contend, section 1223(1) determines when *each* share of stock received in such an exchange is deemed to be held, then Congress could not have intended section 483 to apply to those exchanges, because no "payment" of stock received in such an exchange could by definition occur more than six months after an exchange. In fact, however, while Congress made no explicit reference in section 483 to that section's applicability to exchanges in which gain is not recognized, Congress appears to have contemplated that section 483 would reach those exchanges.

Section 483(f)(3), as originally enacted,[16] provided that no tax on interest would be levied on "any amounts received on account of the sale or exchange of property . . . *if no part of any gain* on such sale or exchange would be considered as gain from the sale or exchange of a capital asset" (emphasis added). The language of this version of section 483(f)(3) was somewhat ambiguous as to whether the exemption applied even if no gain was actually realized from the exchange, or if the gain that did occur was not recognized.[17] The House Report[18] discussing this subsection, however, clarified the congressional intent, stating that "[t]he determination of whether this exception applies is made without regard to* whether, in fact, the sale or exchange results in a gain or *whether the gain (if any) would be recognized"* (emphasis added). Thus, the House Report indicates that the exception to section 483 which is triggered whenever any gain arising out of a sale or exchange would not be treated as gain from the sale of a capital asset applies notwithstanding the fact that no gain is realized, or that the realized gain is not recognized.

In stating that the section 483(f)(3) exception applies when no gain is recognized, Congress must have understood that section 483 would *otherwise* reach exchanges, ostensibly governed by section 1223(1), to which the non-recognition of gain principle applies. If section 483 were *automatically* inapplicable to such exchanges by virtue of section 1223(1), Congress would not have had to specify that these exchanges were within the narrow statutory exemption of section 483(f)(3) when assets which were not capital assets were involved.[19]

---

**16.** In 1976, a clarifying amendment to section 483(f)(3) was enacted. Pub.L. 94–455, Title XIX, § 1901(b)(3)(B), 90 Stat. 1792 (1976). This amendment did not take exchanges in which gain is not recognized out of the ambit of section 483. *Compare* 26 U.S.C. § 483(f)(3) (1976), *quoted in* note 3 *supra* with 26 U.S.C. § 483(f)(3) (1970), *quoted* at 133. *See Solomon,* 570 F.2d at 36.

**17.** The 1976 amendment to section 483(f)(3) makes it clear that the existence of recognized gain is not a prerequisite to the application of

the section 483(f)(3) exception. *See* 26 U.S.C. § 483(f)(3), *quoted in* note 3 *supra.*

**18.** H.R.Rep.No.749, 88th Cong. 1st Sess. (1963), *quoted in* 1964 U.S.Code Cong. & Admin.News, at 1512–13.

**19.** The courts that have previously interpreted the House Report's explanation of section 483(f)(3) have concluded that the intent of the Report was to declare flatly that exchanges involving *capital* assets in which gain is not realized or recognized are not entitled to the section 483(f)(3) exemption, and are thus en-

Thus faced with the question of how both sections 1223(1) and 483 could apply simultaneously to exchanges in which there is no recognition of gain, Treasury Regulation 1.483–2(b)(3)(i) reconciled the two sections by treating what section 483 defines as the interest component of stock delivered more than six months after an exchange as governed by that statute, and by treating the rest of the stock, both deferred and otherwise, as controlled by section 1223(1).[20] We do not view this approach as "unreasonable and plainly inconsistent with the revenue statutes," *Bingler,* 394 U.S. at 749–50, 89 S.Ct. at 1445; *South Texas Lumber Co.,* 333 U.S. at 501, 68 S.Ct. 695. We therefore hold that applying section 483 to appellants' receipt of the reserved Whittaker shares is not barred by section 1223(1).

## IV

Finally, appellants contend that Treasury Regulation 1.483–2(b)(3)(i) and the Commissioner's application of section 483 in this case are inconsistent with Congress' intent in extending non-recognition of gain treatment to contingent stock reorganizations. Appellants note that stock for stock reorganizations in which all of the stock is exchanged at the time of the reorganization are entirely non-taxable. They then assert that since the congressional intent, at least according to *Carlberg, supra,* was to treat contingent stock reorganizations in the same manner, section 483, by taxing the part of a contingent exchange which repre-

sents interest, frustrates the congressional will.

█ Appellants' claim, however, reads the corporate reorganization provisions too broadly and gives insufficient weight to the legitimate aims of section 483. We need not discuss the legislative history of section 483 in detail; that task has already been skillfully performed by the Second Circuit in *Solomon.*[21] Suffice it to say that in enacting section 483, Congress intended primarily to prevent taxpayers from converting ordinary income to capital gain, which is taxed at a lower rate, by eliminating, in contracts for the sale or exchange of property, all reference to an interest component in deferred payments despite the fact that the dollar amount of the deferred payments was larger than it would have been had payment been made immediately. Many who testified at hearings on the legislation urged Congress to draft a narrow bill, on the theory that not all deferred payments were designed to contain hidden interest. Notwithstanding these suggestions, in extending the reach of the section to *"any payment"* made in the course of *"any* contract for the sale or exchange of property,"* Congress "opted for a broad, prophylactic approach to the problem of unstated interest, making the operation of § 483 dependent upon certain objectively verifiable circumstances which had usually evidenced a potential for the abuse against which the section was aimed and not on the subjective

---

compassed within section 483. *Jeffers,* 556 F.2d at 994–95; *see Solomon,* 570 F.2d at 36 n.13. As the text of this opinion suggests, it may be that the House's rationale was not so much to emphasize that exchanges of *capital* assets in which no gain was recognized failed to qualify for the exemption as it was to indicate that the exemption reached assets which *were not* capital assets even when the non-recognition of gain provisions applied. We emphasize, however, that whether the purpose of the House Report's statement about section 483(f)(3) is the one to which we referred, or the one suggested by the *Jeffers* and *Solomon* courts, that statement necessarily presupposes a congressional understanding that exchanges involving capital assets governed by the non-recognition of gain sections of the Code are within the ambit of section 483.

**20.** Appellants assert that this question must be resolved, as in *Fox,* by applying the narrower statute, which they contend to be section 1223(1) over the more general one, which they argue is section 483. We find *Fox* to be inapposite, however, because in that case there was no indication that Congress intended section 483 to apply to divorce property settlement payments. Because we do find evidence of congressional intent that section 483 apply to the exchange at issue in this appeal, we will not ignore evidence of that intent in favor of a mechanical theory giving precedence to narrow provisions over broad ones.

**21.** *See Solomon, supra,* at 33–34 & nn.6–8.

intent of the parties to a sale." *Solomon, supra,* at 33; *see Jeffers, supra,* at 995. These objective factors—most notably that "payment" was made more than six months after the exchange took place, § 483(c)(1); that the agreement allowed for payments to be made more than one year after the exchange, § 483(c)(1)(A); and that there was no provision for interest in the Agreement, § 483(c)(1)(B)—were present in this case. Because they were present, and because Congress' power to pass such a far-reaching statute is not questioned by appellants, we conclude that the Commissioner acted appropriately in applying section 483 to appellants' receipt of the reserved shares of Whittaker stock, regardless of whether or not appellants intended that part of the reserved Whittaker shares would constitute interest.

Moreover, in imposing a tax on the interest component of appellants' transaction, the Commissioner was not unfaithful to Congress' aim in enacting section 354(a)(1) and related provisions. Once again we emphasize that Congress intended only to defer taxation of any gain realized by parties to those reorganizations. In taxing only appellants' Whittaker shares which represented interest, and in treating the rest as non-taxable, the Commissioner fulfilled the spirit of both section 483 and the Code provisions relating to "Type B" corporate reorganizations.

Therefore, the Tax Court's order determining a deficiency in appellants' income tax due for the taxable year 1971 will be affirmed.