JERROLD L. KINGSLEY AND JUNE H. KINGSLEY, PETITIONERS V. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9034–75.     Filed September 17, 1979.

*Eugene J. Brenner* and *Michael L. Curtis,* for the petitioners.
*Peter D. Bakutes,* for the respondent.

FAY, *Judge:* Respondent determined a deficiency of $36,306 in petitioners' 1970 Federal income tax. The principal issue presented is whether certain shares of stock delivered to petitioner Jerrold L. Kingsley in connection with a tax-free reorganization are subject to the imputed interest rules of section 483.[1] If section 483 is applicable, we must then decide how those shares are to be valued.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time they filed their petition in this case, petitioners, Jerrold L. Kingsley and his wife June Kingsley, resided in San Francisco, Calif.

Prior to October 31, 1966, Jerrold L. Kingsley (hereinafter

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.

petitioner) was the sole shareholder of a California corporation named Household Research Institute (HRI). On October 31, 1966, petitioner entered into an agreement with American Home Products Corp. (American), a Delaware corporation, whereby petitioner conveyed to American all of the oustanding shares of HRI solely in exchange for shares of American. The agreement was closed in New York City on October 31, 1966. The parties stated in the agreement that it contained their entire contract, and that it was to be construed under New York law.

Paragraph II B of the agreement provided as follows:

In consideration of the foregoing and in exchange therefor:

1. BUYER [American] will at closing deliver to SELLER [petitioner] certificates registered in the name of SELLER for 15,070 shares of the Common Stock of BUYER fully paid, validly issued and non-assessable, with all issue or transfer taxes paid by BUYER.

2(a). BUYER will reserve at closing an additional 2,775 shares of its Common Stock and upon occurrence of the later of (i) the expiration of three years after closing and (ii) the completion by the Internal Revenue Service of final audits with respect to the Company's federal tax liability for all taxable years and including the year in which this transaction occurs, BUYER will deliver to SELLER certificates for 2,775 shares reduced by that number of shares at $81 per share most nearly equal to the amount of all claims for indemnification theretofore asserted by BUYER in accordance with Paragraph II C.[2] [Arbitration clause omitted.] All certificates delivered to SELLER after closing shall be fully paid, validly issued and non-assessable shares of BUYER's Common Stock and shall be registered in SELLER's name with all issue or transfer taxes paid by BUYER.

(b) If BUYER shall declare any cash dividends on its Common Stock with a record date after closing and before delivery is made to SELLER, the actual quantity of shares to be delivered at the time of delivery as determined in accordance with the next preceding paragraph shall be increased by that number of shares of BUYER's Common Stock as are most nearly equal in value at $81 per share to the aggregate dividends so declared on such quantity of shares.

(c) In the event of any changes in the capitalization of BUYER between the date hereof and delivery by way of stock split, stock dividend or stock reclassification which affect the authorized or outstanding Common Stock of BUYER, the numbers of shares of such stock specified above shall be adjusted to such numbers of shares as will appropriately reflect such change.

Basically, the language quoted above provided that about 15 percent of petitioner's selling price, consisting of shares of

---

[2]Paragraphs I A and II C of the agreement contained long lists of standard warranties and indemnities by which petitioner promised he had completely and fairly disclosed the financial condition of his company.

American stock, would be "reserved" by American subject to contingencies and later delivered. Clauses 2(a), 2(b), and 2(c) provided that adjustments in the number of shares to be delivered would be made for undisclosed claims or back taxes, interim dividends, and stock splits, assuming a price of $81 per share. The $81 figure was used because petitioner and his investment counselor agreed with American that its shares, which on October 31, 1966, traded on the New York Stock Exchange at a mean price of $74.75, were undervalued.

Paragraph II B of the agreement, providing that some shares were to be reserved and later delivered, was not part of the original price negotiations and only entered the deal as counsel for American presented petitioner with a draft contract. Petitioner had no objection, however, and on his suggestion, the number of reserved shares was increased from a proposed 10 percent of the total to approximately 15 percent. Petitioner felt he knew his books were accurate and believed no claims would be forthcoming. Thus, petitioner was confident he would eventually receive the price he had bargained for and would not be losing dividends in the interim. Both parties were represented by counsel in the negotiation and execution of their agreement.

Events transpired as planned. American asserted no claims for indemnification and on April 1, 1970, delivered an additional 6,153 shares of its common stock to petitioner.[3] This figure was reached under the agreement's adjustment clauses, set forth above. Between October 1966 and April 1970, the common stock of American split two-for-one, thus the 2,775 shares petitioner was due under the agreement were increased to 5,550 shares pursuant to clause 2(c) of paragraph II B. Similarly, during the same period American declared cash dividends which would have totaled $24,442 on the reserved shares, and for that reason the number of shares to be delivered was increased by 603 ($24,-422 ÷ $40.50/share after split) pursuant to clause 2(b). On April 1, 1970, American's common stock traded on the New York Stock Exchange between 64½ and 65¼ for a mean of $64.875 (after

[3]The record nowhere states how this date was chosen. The agreement merely provided for delivery upon the later of either 3 years after closing or completion of any Federal tax audits for 1966 and earlier years. In the normal course of events, if HRI had been a calendar year taxpayer and had not requested any filing extensions, its 1966 Federal income tax return would have been due Mar. 15, 1967 (sec. 6072(b)), and the statute of limitations with respect to 1966 would have closed on Mar. 15, 1970 (sec. 6501(a)). Apr. 1, 1970, came shortly thereafter and may have been convenient. See also sec. 1.1502–76(c), Income Tax Regs.

the split), and at that price, the 6,153 shares petitioner received were worth $399,175.

The 15,070 shares of American common delivered to petitioner at closing in 1966 were not restricted in any way, and petitioner received dividends on the shares, voted them, and disposed of some before April 1970. The shares petitioner received on April 1, 1970, were paid out of American's treasury stock and were not outstanding prior to that time. Petitioner neither voted nor received cash dividends on, nor reported any dividends on either the 2,775 shares (5,550 after the stock split) reserved under the agreement or the 603 shares paid in lieu of interim cash dividends. No interest was provided with respect to the later delivered shares.

Respondent and petitioner agree that both the initial transaction and the later delivery of reserved shares constituted a tax-free "B" reorganization under sections 354(a)(1) and 368(a)(1)(B).[4] In his statutory notice, respondent increased petitioner's taxable income for 1970 by $63,361 of interest imputed under section 483. See sec. 1.483–1(e)(3), example (2), Income Tax Regs.

OPINION

In October 1966, petitioner and American Home Products Corp. (American) entered into a tax-free reorganization agreement under which petitioner exchanged all of his stock in Household Research, Inc. (HRI), solely for shares of American common stock. In accordance with the agreement, petitioner received 15,070 shares immediately upon closing. The agreement also provided that an additional 2,775 shares of American stock were to be reserved and delivered to petitioner at an indefinite time no earlier than 3 years later. The number of reserved shares was to be reduced for undisclosed claims, back taxes, breaches, etc. The agreement further provided that the number of shares to be later delivered would be adjusted to reflect any stock splits, stock dividends, or cash dividends that would have been paid since closing on the reserved shares. Pursuant to the agreement, in April 1970, petitioner received 6,153 shares of American common stock having a fair market value of $399,175.

---

[4]See Rev. Procs. 66–34, 1966–2 C.B. 1232, and 67–13, 1967–1 C.B. 590 (superseded by Rev. Proc. 77–37, 1977–2 C.B. 568); sec. 1.483–2(a)(2), Income Tax Regs.

Because the agreement made no provision for the payment of interest on this deferred delivery of shares, respondent determined that $63,361 of the value of such shares constituted interest income under section 483.

We are faced with two issues. The first issue is whether section 483 applies to petitioner's 1970 receipt of 6,153 shares of American common stock under the terms of a 1966 reorganization agreement. If section 483 is applicable, we must then decide how to value the shares received.

Section 483 provides generally that when a contract for the sale or exchange of property calls for deferred payments with respect to which no interest or unreasonably low interest is provided, a portion of the amounts received is treated as ordinary interest income rather than as part of the sales price.[5] The statute is broadly drafted to apply to "any payment" otherwise satisfying the section's mechanical requirements.[6] Sec. 483(c), set forth in text, *infra*.

Petitioner first argues section 483 does not apply to the shares he received in 1970 because Congress did not intend to impute interest income on deferred shares in tax-free reorganizations. His position is that Congress only meant to recharacterize installment sales in which payments for the forbearance of a debt were disguised as capital gain. Respondent argues that section 483 applies to reorganizations just as it does to any sale or exchange not specifically excepted.[7] We agree with respondent.

It is true that the legislative history does not reveal whether Congress ever considered the applicability of section 483 to tax-free reorganizations. See H. Rept. 749, 88th Cong., 1st Sess. (1964), 1964-1 C.B. (Part 2) 125, 196–198; S. Rept. 830, 88th Cong., 1st Sess. (1964), 1964-1 C.B. (Part 2) 505, 605–608. However, petitioner's contention that section 483 does not apply to shares received in a tax-free reorganization has been consis-

---

[5]SEC. 483. INTEREST ON CERTAIN DEFERRED PAYMENTS.

(a) AMOUNT CONSTITUTING INTEREST.—For purposes of this title, in the case of any contract for the sale or exchange of property there shall be treated as interest that part of a payment to which this section applies which bears the same ratio to the amount of such payment as the total unstated interest under such contract bears to the total of the payments to which this section applies which are due under such contract.

[6]But see *Fox v. United States,* 510 F.2d 1330 (3d Cir. 1975) (sec. 483 does not apply to payments incident to a divorce, which are controlled by secs. 71 and 215).

[7]See secs. 1.483–1(b)(6), example (2); 1.483–1(e)(3), example (2); and 1.483–2(a)(2); and 1.483–2(b)(3)(i), Income Tax Regs.

tently rejected by the Circuit Courts of Appeals, this Court, and the Court of Claims. *Vorbleski v. Commissioner*, 589 F.2d 123 (3d Cir. 1978), affg. sub nom. *Catterall v. Commissioner*, 68 T.C. 413 (1977); *Katkin v. Commissioner*, 570 F.2d 139 (6th Cir. 1978), and *Solomon v. Commissioner*, 570 F.2d 28 (2d Cir. 1977), both affg. *Solomon v. Commissioner*, 67 T.C. 379 (1976); *Cocker v. Commissioner*, 68 T.C. 544 (1977); *Jeffers v. United States*, 214 Ct. Cl. 9, 556 F.2d 986 (1977). None of those cases found anything in the legislative history warranting such a limited reading of the broad "any payment" language of the statute. We see no reason at this time to reexamine our prior holdings in *Cocker, Catterall,* and *Solomon.* For the reasons expressed in those decisions, we follow them here and hold that section 483 may apply to deferred payments of stock in a tax-free corporate reorganization.

Petitioner's stronger argument is that section 483 applies only if some payment under a contract is due more than a year after the date of the sale or exchange. He contends the 1970 delivery of reserved shares was not a "payment" as that term is used in the statute. In holding that section 483 may apply to reorganizations, we have already ruled that "payments" may take the form of shares of stock as well as money. However, it is petitioner's contention that the shares became essentially his in 1966 when the contract was closed, and that their delivery to him in 1970 was no more than a release from security. Thus, using general principles drawn from many branches of the law, petitioner variously argues that his right to the reserved shares was fixed subject only to defeasance on condition subsequent, that he was the equitable owner of the reserved shares, that he had substantially all of the economic benefits of ownership of the shares, and that the shares were held as a security device by American under an arrangement constituting an informal escrow. In short, petitioner contends that in his agreement he received all of the rights of a "payment" at closing in 1966 and, consequently, there were no subsequent payments to which section 483 could apply.[8] Respondent replies that the transaction in this case fits squarely within section 483 and that petitioner's

---

[8]See generally I. Feldman, "Does Section 483 apply to a 'B' reorganization where there is a contingent stock guarantee?" 40 J. Tax. 204 (1974); 31 Vand. L. Rev. 400 (1978).

constructions of the agreement are either incorrect or inapposite. We agree with respondent.

To begin with, it is clear that the delivery of shares in 1970 falls within the literal language of section 483. The payments to which the statute applies are defined in section 483(c) which provides in relevant part as follows:

(1) IN GENERAL.—*Except as provided* in subsection (f), this section shall apply to *any payment* on account of the sale or exchange of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange under a contract—

(A) under which some or all of the payments are due more than one year after the date of such sale or exchange, and

(B) under which, using a rate provided by regulations prescribed by the Secretary or his delegate for purposes of this subparagraph, there is total unstated interest. [Emphasis added.]

The shares petitioner received in 1970 were part of the purchase price due under a contract of sale, were due no earlier than 3 years after the date of the sale or exchange, and bore no interest. It is obvious that section 483, literally applied, would treat part of the shares received as unstated interest.

However, to support his contention that what he received in 1970 was not a "payment," petitioner argues that "payment" as used in section 483 does not include "delivery" as that term is used in the agreement. He would read the agreement as setting apart certain shares for his benefit to be held by American and released to him approximately 3 years later. Based on that, petitioner characterizes the provisions for later delivery as a mere security device.

Since petitioner asks us to construe the agreement, we here note that the agreement speaks for itself and that no evidence was introduced at trial which would cause us to rule otherwise. New York strictly follows the parol evidence rule (*Higgs v. De Maziroff*, 263 N.Y. 473, 189 N.E. 555 (1934)), and interprets contracts by their plain meaning whenever possible (*Western Union Tel. Co. v. American Communications Assn.*, 299 N.Y. 177, 86 N.E.2d 162 (1949)). The meaning of paragraph II B of the agreement is plain on its face, and the agreement contained an integration clause.

In support of his position that certain shares were held for him or held back by American, petitioner points out that the first line of paragraph II B 2(a) of the agreement required American to "reserve" 2,775 shares as part of the purchase price. However,

nowhere did the agreement require that any "reserved" shares be issued to or for anyone prior to delivery. All the agreement went on to provide was that the number of American's shares to be delivered at some point in the future would be adjusted downward in the event of any claims for indemnification and upward to reflect any stock splits or interim dividends. The agreement provided for a second payment in the future, not that any shares be held for petitioner. In any case, petitioner's argument, that at closing he received a bundle of rights equivalent to ownership, is irrelevant because whatever the precise legal description of his rights, they were rights and not shares.

Moreover, even if we were to look outside of the four corners of the agreement, the actions of the parties to the agreement were inconsistent with petitioner's characterizations. See *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 133 N.E.2d 688, 150 N.Y.S.2d 171 (1956). The shares delivered to petitioner on April 1, 1970, were not outstanding prior to that date; no specific shares were segregated for petitioner or held in his name by American prior to April 1, 1970; the shares reserved under the agreement were not delivered or paid to an escrow agent, trustee, or any other agent of petitioner prior to 1970; no dividends were paid on any such shares nor did petitioner report any such dividends; and petitioner was not entitled to vote the shares reserved prior to their actual receipt in 1970. There is simply no way we could reasonably hold that the shares petitioner received in 1970 were in any meaningful sense delivered or paid in 1966. On the basis of the record in this case, we cannot see any relevant distinction between "delivery" in 1970, which petitioner concedes was bargained for and in fact occurred, and "payment" as that term is defined in section 483(c). See *Solomon v. Commissioner*, 570 F.2d at 34; *Katkin v. Commissioner*, 570 F.2d at 142; *Vorbleski v. Commissioner*, *supra*.

Finally, petitioner argues that his case is excepted from the application of section 483 because his right to delivery of the reserved shares was not contingent but was fixed subject to a condition subsequent,[9] and because the agreement had the effect

---

[9]The thrust of petitioner's argument here is somewhat confused. A payment of money on a contract 3 years after a sale would fall under sec. 483 no matter how absolutely and irrevocably fixed was the

of creating an informal escrow of the reserved shares. Petitioner apparently tries to bring his case within a perceived gap between two examples in the regulations, sec. 1.483–1(b)(6), examples (7) and (8), Income Tax Regs.[10] Example (8) of the cited regulations holds that section 483 does not apply to the release of shares received in a stock-for-stock "B" reorganization that are placed in escrow, to be returned to the acquiring corporation or released to the selling shareholders based on the earnings of the acquired corporation. In that example, the shares placed in escrow were issued to the selling shareholders who were entitled to vote the shares, and dividends were paid with respect to the shares. On the other hand, in example (7) of section 1.483–1(b)(6), Income Tax Regs., it is held that section 483 does apply to the deferred transfer of shares by the acquiror pursuant to nonassignable contingent rights based on the earnings of the acquired corporation.

Petitioner reasons that since the number of shares reserved under the agreement (or at least the 5,550 shares unadjusted for interim dividends) was not contingent but was subject to a condition subsequent, his situation is closer to that of the shares placed in escrow.[11] This argument overlooks the fact that in both examples in the cited regulations, the contingencies are identical. Petitioner nevertheless contends that in substance, paragraph II B of the agreement, which provided for the later delivered shares, served the same purpose as an escrow. However, we need not address petitioner's characterization because his underlying premise is wide of the mark. The stated rationale of example (8) in the regulations cited is that since delivery to a third-party escrow is the equivalent of a "payment" under section 483, there is no further transfer from the acquiror to the seller upon release. Petitioner does not come within the protection of respondent's regulations because there was no delivery, and indeed no convincing showing that the reserved shares were

amount due. (Sec. 483(c).) Petitioner's arguments as to the nature of the contingency are more appropriate on the issue of value under sec. 483(d).

See also *Muheim v. United States*, 524 F.2d 773 (9th Cir. 1975).

[10]See also Rev. Rul. 70–300, 1970–1 C.B. 125 (clarified, Rev. Rul. 72–35, 1972–1 C.B. 139), and Rev. Rul. 70–120, 1970–1 C.B. 124.

[11]But see sec. 1.483–1(e)(3), example (7), Income Tax Regs.; *Solomon v. Commissioner*, 67 T.C. 379, 387 n. 10 (1976); *Farago v. Burke*, 262 N.Y. 229, 186 N.E. 683 (1933) (delivery is an essential element of an escrow); *Menkis v. Whitestone Sav. & Loan Assoc.*, 78 Misc. 2d 329, 356 N.Y.S.2d 485 (Nassau County Dist. Ct. 1974).

held by anyone, prior to April 1, 1970. See *Cocker v. Commissioner*, 68 T.C. at 562–563; *Solomon v. Commissioner*, 67 T.C. at 386–387.

For all of the above reasons, we hold the delivery of American shares to petitioner on April 1, 1970, was a deferred payment, a portion of which must be treated as interest under section 483.

Having held petitioner received a deferred payment within the meaning of the statute on April 1, 1970, we must now decide how to value the shares received. Petitioner contends the shares must be valued at the price the parties set in their agreement, $81 per share (or $40.50 per share after the stock split), on October 31, 1966. Alternatively, petitioner would value the shares at their fair market price on such date, $74.75 per share (before the split or $37.375 after the split). Respondent argues the shares must be valued as of the day they were received, $64.875 per share (after the split) on April 1, 1970. We agree with respondent for the reasons below.

Section 483(d) provides clear guidance with regard to deferred payments that are indefinite as to time, liability, or amount.[14] Any portion of a payment whose liability therefor, due date, or amount cannot be determined on the date of the sale or exchange must be valued on the date of payment.

The 603 shares received in lieu of interim dividends were manifestly indeterminate in 1966 and must be valued as of April 1, 1970. However, petitioner contends the 2,775 "reserved" shares (5,550 after the split) were a fixed liability as of the date the contract was signed. We need not decide this doubtful contention because the due date of the payment was clearly indefinite.[15] The agreement provided that the final payment was to be made upon the occurrence of the latter of the 3 years after closing or the completion by the Internal Revenue Service of final audits with respect to HRI's Federal tax liability for all taxable years up to and including October 1966. The parties

---

[14]Sec. 483(d) provides:

(d) Payments That Are Indefinite as to Time, Liability, or Amount.—In the case of a contract for the sale or exchange of property under which the liability for, or the amount or due date of, any portion of a payment cannot be determined at the time of the sale or exchange, this section shall be separately applied to such portion as if it (and any amount of interest attributable to such portion) were the only payments due under the contract; and such determinations of liability, amount, and due date shall be made at the time payment of such portion is made.

[15]See *Caruth v. United States*, 566 F.2d 901 (5th Cir. 1978) (payments indefinite as to time valued as of date of delivery under sec. 483(d)).

could not have predicted the likelihood or duration of an Internal Revenue Service audit. We therefore must hold that all of the shares received by petitioner on April 1, 1970, are to be taken into account at their mean fair market value as of that date, $64.875 per share, for purposes of applying section 483. We also hold respondent's computation as to the amount of interest imputed is in all other respects correct and accurate. See sec. 1.483–1(e)(3), example (2), Income Tax Regs.

To reflect the foregoing,

*Decision will be entered for the respondent.*